**Ex parte Robert James CAMPBELL, Applicant.**

**No. WR–44,551–03.**

Court of Criminal Appeals of Texas.

April 25, 2007.

Justin M. Waggoner, Houston, for applicant.

Jack Roady, Asst. D.A., Houston, Matthew Paul, State's Attorney, Austin, for state.

### *ORDER*

COCHRAN, J., issued the Order of the unanimous Court.

In 1992, a jury convicted applicant of the murder of Alexandra Rendon in the course of a kidnapping or aggravated sexual assault, and he was sentenced to death. The evidence at trial showed that applicant and Leroy Lewis abducted Ms. Rendon at a gas station, both men raped her, and applicant killed her.

This is applicant's third state application for a writ of habeas corpus seeking relief from his capital murder conviction and sentence of death.[1] Applicant presents three allegations in this application. Specifically, he asserts that (1) his conviction and sentence are unconstitutional because the State withheld evidence favorable to him in violation of his constitutional right to due process; (2) he was deprived of a fundamentally fair trial because of the admission of inherently unreliable DNA evidence; and (3) newly discovered evidence of his innocence independently warrants habeas relief. This application is based on new documentation of the past unreliability of evidence processed at the Houston Police Department Crime Lab and Property Room. Specifically, applicant seeks habeas relief based on two new facts: 1) the 2006 independent investigator reports on the HPD Crime Lab, and 2) the 2005 discovery—among uncatalogued evidence in the HPD property room—of a cigarette butt that had been collected in the investigation of the Rendon murder but never analyzed by a forensic lab.

We conclude that applicant has failed to meet the statutory requirements set out in Section 5 of Article 11.071 of the Texas Code of Criminal Procedure,[2] and that this

---

1. This Court affirmed applicant's conviction and sentence on direct appeal in 1995. *Campbell v. State*, 910 S.W.2d 475 (Tex.Crim. App.1995). Applicant filed his initial post-conviction application for writ of habeas corpus in the convicting court on April 23, 1997. This Court denied relief. *Ex parte Campbell*, No. WR–44,551–01 (Tex.Crim.App. Mar. 8, 2000) (not designated for publication). Applicant filed his first subsequent application on May 28, 2003, in which he asserted that his execution would violate the Eighth Amendment because he was mentally retarded and that the jury should have determined the issue of mental retardation. This Court dismissed applicant's first subsequent application on July 2, 2003. *Ex parte Campbell*, No. WR–44,551–02 (Tex.Crim.App. July 2, 2003) (not designated for publication). This second subsequent application was filed in the trial court on August 14, 2006.

2. TEX.CODE CRIM. PROC. art. 11.071 provides in part

Sec. 5. (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071 or 37.0711.

Court is therefore barred, under Texas law, from considering these claims. We also note that applicant, in presenting what otherwise would appear to be a viable challenge to the DNA evidence presented at his trial, failed to inform this Court that he was granted post-conviction DNA testing in this case, and that the results of that testing, done by the Texas Department of Public Safety, are consistent with, and more damning than, the DNA evidence that was presented at trial.

## I.

The evidence is well summarized in the Fifth Circuit's opinion denying a certificate of appealability on any claim:

On January 3, 1991, Alexandra Rendon left her job at Bank One between 10:00 and 10:30 p.m. She was wearing a white leather skirt, a cream-colored dress coat with snake skin patches on the shoulders, a high school graduation ring, an engagement ring, and a watch. At 10:53 p.m. Ms. Rendon purchased gasoline at a Chevron station located near her place of employment. The next day, Ms. Rendon's mother realized that her daughter was missing, and on January 5, she contacted the police about her daughter's disappearance.

On January 14, 1991, the police picked up Lawrence Thomas, Campbell's friend of three years, for questioning. Thomas told the police that Campbell had told him that he and his friend Lewis had gotten a car from a lady at a gas station, driven her to a field, and shot and killed her. On January 15, Thomas led the police to the field where Campbell had told him that Ms. Rendon's body was located. On January 16, the police arrested Campbell for Ms. Rendon's murder.

At trial, the State presented several witnesses whose testimony tied Campbell to the commission of Ms. Rendon's murder. Campbell's friends Thomas, Carey Pennamon, and Jesse Criff all testified that Campbell told them that he had shot and killed a woman whose car he'd taken at a gas station. Campbell also mentioned to two friends watching a news story about Ms. Rendon's murder, Otha Norton and Sheila Robeson, that Ms. Rendon looked like the woman he'd shot and killed.

Additionally, Campbell told Thomas, Criff, and Pennamon that he'd shot at Ms. Rendon twice, hitting her the second time. He told Pennamon that he told her to "run, bitch run" before shooting at her and told Thomas that he'd told her to walk away from the car before shooting at her. He showed Thomas the field where he'd left Ms. Rendon's body, and described the location to Criff. That field was where the police later recovered Ms. Rendon's body.

The police also recovered many of Ms. Rendon's belongings from Campbell's friends and family. They recovered the coat Ms. Rendon had been wearing from Campbell's mother Wilda, the class ring and watch she had been wearing from Campbell's girlfriend Demetrius Brown, and the gun used to kill Ms. Rendon from Campbell's friend Pennamon. Pennamon testified that Campbell had asked him to hold onto the gun. Campbell offered Ms. Rendon's white leather skirt, which Thomas had seen earlier in the car Campbell was driving, to his friends Robeson and Norton. Robeson declined the skirt because it was dirty and Norton later threw it away. Campbell told Pennamon that he had taken the personal belongings of the woman he had killed. Campbell also drove numerous friends, including Thomas, Norton, and Robeson around in a car identical to Ms. Rendon's.

The police recovered semen of two men from Ms. Rendon's body. Campbell told Criff that he had sex with his victim and told Thomas that Leroy Lewis, who was with Campbell that night, had also had sex with her. DNA testing further determined that 85.3% of African–American males could be excluded from contributing the semen attributed to Campbell, and only four percent of African–American males could have contributed the semen attributed to Lewis.[3]

## II.

Texas law prohibits successive writs challenging the same conviction except in specifically defined circumstances.[4] Applicant asserts that his subsequent application should be considered on its merits because it presents those circumstances. First, he states that his current claims rest on factual bases—the 2006 independent investigator reports on the HPD Crime Lab and the 2005 discovery of the cigarette butt—that were not available when he filed his previous applications. Tex.Code Crim. Proc. art. 11.071, § 5(a)(1). Second, he states his current claims, premised on these facts, establish constitutional violations. *Id.*

To satisfy section 5(a)(1), a subsequent application must contain sufficient specific facts establishing that "the current claims and issues have not been and could not have been presented previously in a timely

initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application." [5] We have interpreted this to mean that, to satisfy Art. 11.071, § 5(a), 1) the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications; [6] and 2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence.[7]

### 1. Unavailability

Applicant argues that the factual bases of his claims—the 2006 reports on the HPD Crime Lab, and the 2005 discovery of the cigarette butt—were not available when he filed his previous applications. The State does not contest that these facts were previously unavailable when applicant filed his initial writ application in 1997, and his first subsequent application in 2003. We agree. Although applicant's first subsequent writ was filed after the problems with the HPD Crime Lab came to light late in 2002,[8] applicant's claim rests on information contained in the independent investigator reports published in 2006.

Those reports are extremely critical of the past work of two key witnesses in applicant's trial—Kristy Kim, a criminalist, and James Bolding, the head of the crime

3.  *Campbell v. Dretke,* 117 Fed.Appx. 946, 950 (5th Cir.2004) (not designated for publication) (footnotes omitted).

4.  Tex.Code Crim. Proc. art. 11.071, § 5.

5.  Tex.Code Crim. Proc. art. 11.071, § 5(a)(1).

6.  *Ex parte Hood,* 211 S.W.3d 767 (Tex.Crim. App.2007)

7.  *See Ex parte Brooks,* 219 S.W.3d 396, 400–01 (Tex.Crim.App.2007) (noting that, in a subsequent application, a habeas applicant must make a prima facie showing of facts that establish a cognizable constitutional claim); *Ex parte Staley,* 160 S.W.3d 56, 64 (Tex.Crim. App.2005).

8.  *See Ex parte Green,* 159 S.W.3d 925, 925–26 (Tex.Crim.App.2004) ("The problems with the Houston Police Department Crime Lab did not come to light until late in 2002.") (Price, J., dissenting statement).

lab. For example, the reports note that both were associated with cases in which the crime lab reported conclusions that were inconsistent with the actual testing performed by the analysts. In one case, testing performed by Kim excluded the defendant as a donor to the sample, but Kim nevertheless reported that the defendant could have been a contributor. In another case, Bolding allegedly altered the results of blood-typing work on the basis of a scientifically unjustifiable explanation, gave misleading testimony regarding the statistical significance of his reported conclusion, and gave false testimony about his credentials. It would be unreasonable to assume that applicant should have known about the specific deficiencies of these witnesses who testified in his trial until these reports were made public.

Likewise, the "lost" cigarette butt was "found" and disclosed to applicant in 2005, well after his prior writs were filed. Thus, applicant has facially surmounted the "unavailability" hurdle of Section 5(a)(1).

## 2. Prima Facie Showing

Applicant also must jump over the rest of the section 5(a)(1) bar. That is, his appli-

cation must allege sufficient specific facts that, if proven, establish a federal constitutional violation sufficiently serious as to likely require relief from his conviction or sentence.[9]

Applicant makes three constitutional claims. First, he claims that the State's failure to disclose to him before trial the HPD Crime Lab problems and the cigarette butt collected during the investigation of the crime resulted in a violation of due process under *Brady v. Maryland*.[10] Second, he claims that the admission of unreliable DNA test results from the HPD crime lab resulted in a fundamentally unfair trial under *Barefoot v. Estelle*.[11] And third, he claims that the HPD crime lab problems and the cigarette butt are evidence of his innocence under *Ex parte Elizondo*.[12] All three of applicant's claims are premised on a finding that the DNA evidence at applicant's trial painted "an unfair picture" for the jury.

In its Motion to Dismiss, the State vehemently contests these factual assertions by applicant.[13] Claim by claim, the State refutes each of applicant's assertions.[14]

---

**9.** *See, e.g., Ex parte Brooks*, 219 S.W.3d at 400–01; *Ex parte O'Brien*, 190 S.W.3d 677, 680–83 (Tex.Crim.App.2006) (Cochran, J., concurring statement) (noting that consideration of applicant's subsequent writ application was barred under article 11.071, § 5 because he failed to make a prima facie showing that his constitutional claim was meritorious).

**10.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**11.** 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

**12.** 947 S.W.2d 202 (Tex.Crim.App.1996).

**13.** The State is not barred from responding to a subsequent writ application, and when the facts in such an application are incomplete, misstated, or subject to misinterpretation, a response may be helpful to this Court in de-

termining whether the subsequent application surmounts the section 5 bar.

**14.** Among other things, the State argues in its motion to dismiss that (1) there is no evidence that the State knew of the crime lab problems in 1992; (2) the independent investigator reported that there were major issues (that is "deficiencies that raise significant doubt as to the reliability of the work performed, the validity of the Crime Lab's results, or the correctness of the analysts' conclusions") in three other death penalty cases, but not in applicant's case; (3) post-conviction DNA testing results were consistent with—and far more inculpatory than—the results presented at the trial; and (4) there are no facts showing that the cigarette butt constitutes exculpatory evidence. Thus, according to the State, applicant has not made even a threshold showing of a *Brady* violation, the denial of a fair trial, or actual innocence.

Most importantly, the State fairly knocks the applicant's pitched premise-that the DNA evidence at applicant's trial painted an unfair picture for the jury-out of the ball park by noting that post-conviction DNA testing supported the DNA findings admitted at trial. The post-trial testing, using scientifically improved techniques, showed that the probability of an unrelated person selected at random who could be a contributor to the anal specimen taken from Ms. Rendon was 1 in 620,000 of African–American males. Thus, applicant does not, under these circumstances, state even a potential violation of the United States Constitution.

Inexplicably, applicant did not address the post-trial DNA testing in his writ application except to state, in a footnote, that

> On April 2, 2002, on Campbell's application for further DNA testing under article 64.03 of the Texas Code of Criminal Procedure, the trial court entered an order providing that the "Harris County District Attorney's Office obtain from the Houston Police Department Crime Lab all remaining biological evidence" in Campbell's case and submit it to further DNA testing. Presently, full compliance with this Order has not occurred be-

cause the cigarette butt has never been submitted to further DNA testing.[15]

Applicant hid the ball in his writ application. His Chapter 64 request, the trial court's retesting order, the DPS results, and the trial court's findings are all attached as exhibits to the State's motion and are as much a part of this habeas record as are applicant's attachments.

They tell a story applicant saw fit to omit. In 2001, applicant requested post-conviction DNA testing under article 64.03. He noted that advances in testing techniques could produce results far more accurate and probative than the results of the tests that were offered at trial.[16] Applicant was right. On April 2, 2002, the trial court, finding that the requirements of article 64.03 had been met, granted applicant's request. The prosecution was ordered to obtain "all remaining biological evidence" from the HPD Crime Lab and transport it to the DPS Crime Lab for testing and comparison. The results were unfavorable to applicant; he could not be excluded as a contributor to the sperm fractions of the DNA extract from the victim's vaginal or anal samples. The probability of selecting an unrelated African–American male at random who could be a contributor to the anal mixture was

**15.** Writ Application at 8, note 2. Applicant's present counsel also filed applicant's post-trial DNA motion. Thus, it is clear that he knew of the retesting order and of the test results. In his writ application, he stated only that the cigarette butt had not yet been tested. But applicant has wholly failed to show that there is any logical, legal, or scientific relevance to the stray cigarette butt. This was one of the items placed in the police "wheelbarrow" of possibly relevant items gathered at the crime scene. There is nothing that shows that this cigarette butt was connected to Ms. Rendon's murder or to her killer. It could have been left there at any time by any wayfarer walking by. And even if it had been left by someone at or near the time of Ms. Rendon's murder, testing it for DNA would not prove applicant did not mur-

der her. It might show that someone else smoked a cigarette or dropped a cigarette butt—perhaps Ms. Rendon, perhaps applicant's co-killer, Lewis, or perhaps applicant's friend, Lawrence Thomas, when applicant showed him where applicant had killed Ms. Rendon. If the cigarette butt were tested for DNA and applicant could not be excluded as a contributor, that evidence would be inculpatory. Otherwise, it has no evidentiary significance and would be a proverbial red herring.

**16.** According to applicant's sworn post-trial DNA motion, the original pre-trial DNA testing was conducted by Gary Harmon, a DNA analyst from California, not an HPD Crime Lab analyst.

reported as 1 in 620,000. The probability of selecting an unrelated African–American male at random who could be a contributor to the vaginal mixture was 1 in 211. The trial court made a finding of fact that the results of the testing were not favorable to applicant and that it was "not reasonably probable that, had the DNA testing results been available before or during the trial of the offense, the applicant, Robert James Campbell, would not have been prosecuted or convicted."

Almost at the end of his response to the State's Motion to Dismiss, applicant finally addressed the results of the testing:

> The State also argues that the newly discovered evidence is immaterial because postconviction DNA testing is consistent with HPD's findings, since under neither set of findings could Campbell be excluded as a contributor to the DNA found on the vaginal and anal swabs recovered from Rendon's body.... But the fact that subsequent testing did not exclude Campbell does not necessitate the conclusion that evidence of pervasive improper practices in handling and analyzing DNA evidence would not have had a significant impact on the jury. To the contrary, this evidence would have allowed Campbell's counsel to attack the reliability and probative value of crucial physical evidence and "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." ... Moreover, [the independent investigator's] findings concerning the Crime Lab's lack of evidence control procedures and the likely contamination of DNA specimens directly undermines not only the reliability of the initial testing, but the reliability of the postconviction testing as well, as this testing was performed on samples obtained by HPD Crime Lab personnel in the first instance.

We fail to see how the scientific revalidation and refinement of results from a crime lab that had, in other cases, performed poorly, would (or should) persuade a rational jury to entertain a reasonable doubt of applicant's guilt. Indeed, one wonders whether evidence that the HPD lab had "gotten it wrong" on other tests is even admissible when it clearly "got it right" on this test. Perhaps this evidence is intended to "muddy the waters."

Applicant's failure to be fully forthright to this Court concerning the post-trial DNA testing does not inspire confidence in his legal analysis. Applicant attempts to distinguish his situation from that in *Griffith v. Dretke*,[17] where the Fifth Circuit rejected an almost identical *Brady* claim and noted that subsequent DNA testing supported at least some of the HPD Crime Lab's findings. Applicant asserts the *Griffith* "court's conclusion that the information about the Crime Lab errors did not make the verdict less worthy of confidence was based not on confirmatory postconviction DNA testing results but instead on 'the quantity and strength of other evidence of guilt' "—evidence he asserts is missing in his case. If this is the basis of the *Griffith* court's decision, that "quantity and strength of other evidence of guilt" is present in this case also. Applicant was tied to the crime by his numerous boastful admissions to several different people about the kidnapping, rape, and murder and his possession of significant physical evidence associated with the murder or Ms. Rendon—including the murder weapon and his victim's car, clothes, and jewelry.

**17.** *Griffith v. Dretke,* 2005 WL 2372044, 2005 U.S. Dist. LEXIS 44205 (D.Tex.2005) (not reported in F.Supp.2d) (rejecting *Brady* claim based on the failure to disclose the significant problems with the HPD crime lab).

We have reviewed the application and find that the allegations do not satisfy the requirements of Article 11.071, § 5. Accordingly, the application is dismissed as an abuse of the writ. Article 11.071, § 5(c).