Ex parte Cathy Lynn HENDERSON, Applicant.

No. WR–49984–02.

Court of Criminal Appeals of Texas.

June 11, 2007.

Jani Maselli, Houston, for Appellant.

Laura McElroy, Assistant District Atty., Matthew Paul, State's Atty., Austin, for State.

## ORDER

PER CURIAM.

This is a subsequent application for writ of habeas corpus filed pursuant to article 11.071, § 5, of the Texas Code of Criminal Procedure. Applicant raises three claims in which she asserts that she has newly available evidence that shows that: (1) she is innocent of capital murder; (2) but for constitutional errors she would not have been found guilty; and (3) she is no longer death eligible.

Applicant was convicted of capital murder in May 1995. This Court affirmed her conviction and sentence on direct appeal. *Henderson v. State*, 962 S.W.2d 544 (Tex. Crim.App.1997). In October 1998, applicant timely filed her initial application for writ of habeas corpus and amended it on November 17, 1998. We denied relief. *Ex parte Henderson*, No. WR–49,984–01 (Tex. Crim.App. March 6, 2002) (not designated for publication).

Applicant asserts that the critical issue in her trial was whether she intentionally caused Brandon Baugh's death as asserted by the State or whether Brandon's death was the result of an accidental fall. In this subsequent application, applicant has submitted significant recent scientific research and the affidavits and reports of several scientists. That material indicates that what is called the biomechanical analysis of infant head trauma (an area of scientific research that was beginning to develop in 1995 when applicant was tried and convicted) now shows that the type of head injuries that Brandon Baugh suffered could have been caused by an accidental short fall onto concrete. Although the details have varied, applicant's position throughout has been that Brandon fell out of her arms as she was carrying him and hit his head on the concrete playroom floor.

At the time of trial Dr. Roberto Bayardo, the highly experienced medical examiner for Travis County, testified that it was "impossible" for Brandon's extensive brain injuries to have occurred in the way that applicant stated. He testified that her story was false and "incredible." In his opinion (and that of Dr. Sparks Veasay of Lubbock County), Brandon's injuries had to have resulted from a blow intentionally struck by applicant. He concluded, "I would say the baby was caught up with the hands by the arms along the body and then swung and slammed very hard against a flat surface." In his 1995 opinion, Brandon was an abused baby whom applicant had intentionally murdered.

But according to the affidavits and/or reports submitted by Drs. John J. Plunkett, Peter J. Stephens, Janice J. Ophoven, and Kenneth L. Monson, recent advances in the area of biomechanics and physics suggest that it is perhaps possible that Brandon's head injuries could have been caused by an accidental short-distance fall.

The Honorable Jon Wisser presided over applicant's 1995 trial and is currently presiding over her subsequent writ application. He was sufficiently troubled by the initial scientific evidence presented to him that, on April 4, 2007, he recalled applicant's original death warrant and rescheduled her execution for June 13, 2007, to give her sufficient time to gather addi-

tional material for this subsequent writ application.[1]

Applicant did so. Dr. Bayardo has now submitted an affidavit which, in essence, recants his trial-time conclusive opinion. His affidavit states the following:

> Since 1995, when I testified at Cathy Henderson's trial, the medical profession has gained a greater understanding of pediatric head trauma and the extent of injuries that can occur in infants as a result of relatively short distance falls, based in part on the application of principles of physics and biomechanics. Specifically, and as shown in the reports that I have read, even a fall of a relatively short distance onto a hard surface can cause the degree of injury that Brandon Baugh experienced. If this new scientific information had been available to me in 1995, I would have taken it into account before attempting to formulate an opinion about the circumstances leading to the injury.
>
> I have reviewed the affidavit of John Plunkett dated May 18, 2007, and I agree with his opinion. Based on the physical evidence in the case, I cannot determine with a reasonable degree of medical certainty whether Brandon Baugh's injuries resulted from an intentional act or an accidental fall. In fact, had the new scientific information been available to me in 1995, I would not have been able to testify the way I did about the degree of force needed to cause Brandon Baugh's head injury.

Dr. Bayardo's re-evaluation of his 1995 opinion, which he states is based upon new scientific developments, is a material ex-culpatory fact. In our view, the current application contains sufficient specific facts establishing that applicant's first two claims satisfy the requirements of article 11.071, § 5(a).

We therefore grant applicant's request for a stay of execution and remand this subsequent application for writ of habeas corpus to the trial court for further proceedings on applicant's first two claims. We dismiss her third claim—that she is no longer death eligible—because it is not legally cognizable under article 11.071, § 5.

IT IS SO ORDERED.

KELLER, P.J., filed a dissenting opinion in which Hervey, J. joined.

PRICE, J., filed a concurring statement.

KEASLER, J., filed a dissenting statement.

MEYERS, J., not participating.

KELLER, P.J., dissenting in which HERVEY, J. joined.

Before a court can consider the merits of a habeas application, the application must contain sufficient facts establishing one of the three exceptions listed in Article 11.071, § 5(a).[1] The facts alleged in the present application, even if accepted as true, do not establish any of the exceptions listed in § 5. In *Ex parte Staley*, we explained that an applicant could not meet the § 5(a)(1) exception on the basis of new law simply by relying upon United States Supreme Court cases that established new law.[2] He was still required to show that the facts in his case fit "under the umbrel-

---

1. Judge Wisser wrote, "I decided, although not convinced of the legal correctness of the defendant's position, it is in the interest of justice and the criminal justice system of this state, that the execution date of April 18th be reset to June 13th, 2007. This should permit the defense adequate time to perfect any subsequent writ."

1. Tex.Code Crim. Proc., Art. 11.071, § 5(a).

2. 160 S.W.3d 56, 63–64 (Tex.Crim.App.2005).

la of that 'new' legal claim."[3] Similarly, new facts can show a new factual basis under § 5(a)(1) only if the new facts would establish a claim upon which relief could be granted. Even assuming that the new medical research constitutes "new facts" that were unavailable at the time the previous application was filed, those new facts, even if accepted, do not establish any recognized claim for relief. Consequently, the statutory scheme requires this Court to dismiss the application. Because the Court does not, I respectfully dissent.

PRICE, J., concurring.

In order to proceed to the merits of her claims in this subsequent post-conviction application for writ of habeas corpus, the applicant must satisfy the criteria of Article 11.071, Section 5.[1] She argues that she should be allowed to proceed with her first claim of actual innocence under Article 11.071, Section 5(a)(1), which provides for consideration of the merits of a subsequent application upon a showing of "sufficient specific facts establishing that" her claim of actual innocence could not have been presented in a previous habeas application because "the factual ... basis for the claim was unavailable" before. In my view, the applicant has presented sufficient newly available facts in the form of Dr. Bayardo's affidavit. Dr. Bayardo now avers that, given the new developments in the science of biomechanics, he could not now testify, as he did during the applicant's 1995 trial, that Brandon's head injury could not have been caused by an accidental fall such as that which the applicant described in her trial testimony. He now asserts that he "cannot determine with a reasonable degree of medical certainty whether Brandon

Baugh's injuries resulted from an intentional act or an accidental fall." For the reasons that follow, I believe this constitutes a *prima facie* showing of a cognizable claim of actual innocence.

Under the standard for determining a bare claim of actual innocence announced in *Ex parte Elizondo*, an applicant must show "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence."[2] In conducting this analysis, the reviewing court should view the newly available evidence in the context of the evidence developed during the course of the trial and ask whether any rational juror would still have convicted the applicant given whatever additional perspective the newly available evidence may provide, assuming the juror had also heard that newly available evidence.[3]

In my view, the applicant's newly available evidence is sufficient to establish a *prima facie* case under this standard. At trial, Dr. Bayardo testified that applicant's exculpatory version of how Brandon sustained his injuries could not possibly be true. Dr. Bayardo's affidavit demonstrates that, in light of the new scientific developments, he could no longer testify as he did at trial. This new evidence has the effect of totally nullifying Dr. Bayardo's trial testimony. Adding it to the evidentiary mix means that the jury would no longer have any affirmative evidence to cause it to prefer the theory that Brandon was murdered as opposed to the theory that he was killed accidentally or with some lesser culpable mental state than is necessary to sustain a capital murder con-

3. *Id.*

1. Tex.Code.Crim. Proc. art. 11.071, § 5.

2. 947 S.W.2d 202, 209 (Tex.Crim.App.1996).

3. *E.g., Ex parte Chavez*, 213 S.W.3d 320, 322 (Tex.Crim.App.2006).

viction.[4]  Under these circumstances, it is at least arguable that the evidence is not even legally sufficient to sustain a conviction; that is, a rational jury could not convict the applicant of capital murder.[5]  In any event, it is evident that the applicant has presented a plausible claim that no reasonable juror *would* have found her guilty of a *capital* homicide—at least not to a level of confidence beyond a reasonable doubt.  Thus, the applicant has at least pled facts sufficient to allow her to proceed with her claim of actual innocence.

This differs from the situation in which a lay witness later claims that his or her trial testimony was mistaken or untrue—an ordinary recantation.  In that event the jury that we hypothesize in our *Elizondo* analysis has been presented with two different and conflicting versions of the facts from the same witness and must decide which version to believe.  If the recantation is not particularly compelling under the circumstances, we have no basis to conclude that there is clear and convincing evidence that none of the jurors would have convicted the defendant anyway.  Relief would not be warranted.  But here we have a situation in which the State's ex-pert, upon whose opinion testimony the essential element of culpable mental state hinges, has now withdrawn his earlier expert opinion in light of new scientific developments and has replaced it with a new, presumably better informed, expert opinion.[6]  Accordingly, in applying the *Elizondo* standard, we do not hypothetically envision a jury that is now presented with two conflicting versions of the brute facts.  Instead, we envision a hypothetical jury that has heard an expert who has renounced his own earlier opinion as scientifically invalid.  I do not believe a rational juror would choose to rely upon the expert's abandoned view. This leaves our hypothetical jury with precious little evidence upon which to conclude that the applicant killed Brandon with the *mens rea* necessary to justify convicting her of an offense for which she could suffer the ultimate penalty of death.

Nor am I swayed by the fact that the trial evidence shows that the applicant fled.  Of course, I acknowledge that we have said many times that evidence of flight amounts to some evidence of a guilty conscience.  But I do not believe on the

---

4. In his affidavit, Dr. Bayardo indicated that he had reviewed the affidavit of Dr. John Plunkett, "and I agree with his opinion."  Dr. Plunkett's affidavit is dated May 18, 2007, and it includes the following:

> Neither I …, nor anyone else, can prove Brandon's injury and death was an accident.  However, because of the new scientific information and analysis now available to scientifically evaluate Brandon's injury and death, neither may anyone prove that Ms. Henderson intentionally caused it.  It is impossible for any qualified scientist or physician to conclude, whether to a reasonable degree of medical certainty, or beyond a reasonable doubt, that any intentional and deliberate act by Ms. Henderson caused Brandon Baugh's death, or that the [sic] Brandon's injuries are such as to rule out an accidental cause.

5. *See Nelson v. State*, 848 S.W.2d 126, 138–9 (Tex.Crim.App.1992) (Clinton, J., dissenting); *Mason v. State*, 905 S.W.2d 570, 579–80 (Tex. Crim.App.1995) (Clinton, J., dissenting).

6. I say "presumably" better informed only because the record does not presently suggest otherwise.  This is not to say that on the remand the State cannot challenge the applicant's claims with respect to validity and/or weight of the advances in biomechanical science upon which the applicant, and Dr. Bayardo in his affidavit, rely.  We are not called upon to address the merits of the applicant's claims at this juncture, but only whether she has met the threshold showing for consideration of the merits in the ordinary course of proceedings under Article 11.071.  *See Ex parte Blue*, 230 S.W.3d 151, 163 (Tex.Crim. App.2007).

facts of this case that the applicant's flight provides the jury with any greater basis to prefer the conclusion that she killed Brandon with the requisite intent for capital murder versus some lesser culpable mental state or no *mens rea* at all. In short, while the applicant's flight undoubtedly evinces a guilty conscience, it provides little rational basis to conclude she felt guilty of an *intentional or knowing* murder, as opposed to a reckless or negligent homicide or even an excusable accident. Neither does her statement to her friend that she "killed somebody or murdered somebody" provide a particularly compelling basis to differentiate her level of culpability. That the evidence may still be legally sufficient to convict the applicant even in the face of Dr. Bayardo's affidavit does not mean we cannot conclude that a *prima facie* case has been made that no reasonable juror would have convicted the applicant. In my view she should be permitted to proceed with the claim based upon her newly available evidence so that we may determine, in the normal course of habeas proceedings, whether she can ultimately convince us by clear and convincing evidence.

In her second claim the applicant asserts that she should be allowed to proceed with other constitutional issues under Article 11.071, Section 5(a)(2), which requires a showing of "sufficient specific facts establishing that . . . by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt[.]" This standard requires a lower threshold of confidence (preponderance of the evidence rather

than clear and convincing evidence), but it also requires a showing that no rational juror "could" have convicted, rather than that no rational juror "would" have, as under the *Elizondo* standard governing bare claims of innocence. To me these differences in the applicable standards result in a wash. Given Dr. Bayardo's affidavit, I would also hold that the applicant has shown by a preponderance of the evidence that no rational juror "could" have found her guilty to a level of confidence beyond a reasonable doubt and that the merits of her constitutional claims should therefore be addressed.

With these observations, I join the Court in its order staying the applicant's impending execution and granting her leave to proceed with the first two claims of her subsequent writ application under Article 11.071, Section 5.[7]

KEASLER, J., dissenting.

Without one word of analysis, four members of the Court reach the breathtaking conclusion that Cathy Lynn Henderson's subsequent application meets the requirements of Article 11.071, Section 5(a).[1] Calvin Coolidge once said, "If you don't say anything, you won't be called upon to repeat it." Today the *per curiam* opinion tacitly amends Silent Cal's adage to say "If you don't say anything, you won't be called upon to justify it." The only explanation for the absence of any analysis is that their conclusion is indefensible. They dare not set out their reasons because they might have to defend them. Instead, it is simply, "Because we say so."

Over fifty years ago, Justice Robert H. Jackson warned: "There is a danger that,

7. It is my understanding that the District Attorney of Travis County has made public that he has sent a letter to the Board of Pardons and Paroles in which he has recommended that the Board recommend that the Governor

grant the applicant a thirty-day reprieve. *See* Tex. Const. art. 4, § 11(b).

1. Tex.Code Crim. Proc. Ann. art. 11.071 § 5(a) (Vernon 2005).

if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact." [2] But today, the majority employs neither logic nor common sense.

Section 5(a) prevents us from considering "the merits of or grant[ing] relief based on the subsequent application unless the application contains sufficient specific facts" demonstrating that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt;.... [3]

## I.

Even assuming that the biomechanical evidence regarding causes of infant head trauma was previously unavailable,[4] Henderson has failed to present a cognizable claim of actual innocence based on newly-discovered evidence.[5] The "newly-available" biomechanical evidence does not constitute evidence that "unquestionably establish[es]" Henderson's innocence under *Ex parte Elizondo*.[6] As the majority observes, the affidavits and reports of Drs. John J. Plunkett, Peter J. Stephens, Janice J. Ophoven, and Kenneth Monson concerning recent advances in "biomechanics and physics suggest that it is possible that Brandon's head injuries could have been caused by an accidental short-fall distance." The words "suggest," "possible," and "could" denote uncertainty. And here the obvious uncertainty pertains to whether Brandon's death was the result of an accident. This is a far cry from setting out sufficient specific facts establishing actual innocence. Additionally, Dr. Bayardo's revised opinion, which the majority identifies as a "material exculpatory fact," does not affirmatively rule out that Henderson acted intentionally. In short, the evidence submitted by Henderson only serves to support the defense she advanced during her 1995 trial-that Brandon's death was the result of an accident, as opposed to an intentional act. Henderson has therefore failed to make the requisite threshold showing "by clear and convincing evidence that no reasonable juror would have convicted [her] in light of the new evidence." [7]

## II.

Henderson has also failed to set forth sufficient specific facts establishing actual innocence under *Schlup v. Delo*.[8] The ma-

**2.** *Terminiello v. Chicago,* 337 U.S. 1, 37, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Jackson, J., dissenting).

**3.** Tex.Code Crim. Proc. Ann. art. 11.071 § 5(a)(1), (2).

**4.** *Id.* § 5(a)(1), (e).

**5.** *Ex parte Campbell,* 226 S.W.3d 418, 421 n. 7 (Tex.Crim.App. 2007) (citing *Ex parte Brooks,* 219 S.W.3d 396, 400 (Tex.Crim.App.2007); *Ex parte Staley,* 160 S.W.3d 56, 64 (Tex.Crim. App.2005)).

**6.** 947 S.W.2d 202, 209 (Tex.Crim.App.1996).

**7.** *Ex parte Elizondo,* 947 S.W.2d at 209; *see also Ex parte Blue,* No. AP–75,254, 2007 Tex. Crim.App. LEXIS 318, at *27, 2007 WL 676194, *7 (Tex.Crim.App. Mar. 7, 2007).

**8.** 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *see also Ex parte Brooks,* 219 S.W.3d at 400.

jority is sphinx-like about Henderson's *Schlup*-based claims, so I will discuss them here. First, she argues that the trial judge's refusal to appoint a biomedical expert constituted a due process violation under *Ake v. Oklahoma.*[9] Second, reasserting an issue raised and rejected on direct appeal,[10] she claims that the trial judge's "orders regarding production of the confidential map and refusing to suppress the evidence that the state obtained through use of the map violated [her] rights under the Fifth and Sixth Amendments." Relying on *Fisher v. United States,*[11] she asserts that we erred in overruling her claim. Because this Court has already rejected the merits of this claim, it is procedurally barred[12] and therefore not cognizable.[13] Considering Henderson's *Ake* due process claim, under Section 5(a)(2), she must make a *prima facie* showing of actual innocence. Henderson must therefore make a threshold showing that no rational juror could have found her guilty beyond a reasonable doubt in light of the new evidence.[14] For the same reasons discussed above with respect to her free-standing claim of actual innocence, Henderson has not met her burden under Section 5(a)(2). Henderson's actions following Brandon's death support this conclusion.

The author of Proverbs tells us, "The wicked flee when no man pursueth, but the righteous are bold as a lion."[15] Over two thousand years later, in less majestic language, we noted that "[w]e have repeatedly held that flight is evidence of a circumstance from which an inference of guilt may be drawn."[16] And this concept comports with common sense.

What is an innocent man or woman's reaction when a baby has a serious accident? Is it to bury the baby and flee the state? Of course not. He or she administers first aid, calls an ambulance, calls a neighbor for help, drives the baby to the hospital—in short, takes remedial action. What did Henderson do? She buried Brandon's three-and-a-half-month-old body and skedaddled to Missouri.

And what did Henderson do then? Why, she sipped a few margaritas and, according to her friend and confidant, admitted that she had "killed somebody or murdered somebody."[17] Is this consistent with her innocence? Of course not.

We at least give lip-service to the principle that we consider the totality of the circumstances when deciding whether an application meets the requirements of Section 5(a). So in inferentially doing so, I can only conclude that the Court has used the "divide and conquer" or "piecemeal" analysis of the evidence condemned by the Supreme Court in *United States v. Arvi-*

9. 470 U.S. 68, 83–87, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

10. *Henderson v. State,* 962 S.W.2d 544, 551–57 (Tex.Crim.App.1997).

11. 425 U.S. 391, 404, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

12. *Ex parte Acosta,* 672 S.W.2d 470, 472 (Tex. Crim.App.1984).

13. *Ex parte Campbell,* 226 S.W.3d at 421 (citing *Ex parte Brooks,* 219 S.W.3d at 400; *Ex parte Staley,* 160 S.W.3d at 64).

14. TEX.CODE CRIM. PROC. ANN. art. 11.071 § 5(a)(2).

15. *Proverbs* 28:1 (K J V).

16. *Colella v. State,* 915 S.W.2d 834, 839 n. 7 (Tex.Crim.App.1995) (citing *Foster v. State,* 779 S.W.2d 845, 859 (Tex.Crim.App.1989)); *see also Hernandez v. State,* 939 S.W.2d 173, 178 (Tex.Crim.App.1997); *Valdez v. State,* 623 S.W.2d 317 (Tex.Crim.App.1981); *Holloway v. State,* 525 S.W.2d 165 (Tex.Crim.App.1975).

17. 31 R.R. at 347.

$zu$[18] rather than considering the evidence as a whole.[19]

### III.

Finally, the Court brushes aside Henderson's third claim—that she is no longer a future danger. But that is inconsistent with our opinion in *Berry v. State*,[20] handed down less than two weeks ago, in which the same five-judge majority held that a defendant who murdered one child and left another naked in a ditch on an anthill was not a future danger to society and reformed her sentence from death to life imprisonment. According to the majority's reasoning, Henderson would be less culpable than Berry. The majority should explain why this claim is not cognizable. This claim amounts to nothing more than a challenge to the sufficiency of the evidence, which, in fact, is not cognizable.[21]

In *Berry*, and again today, I detect a tendency in the majority of this Court to minimize the culpability of criminals who victimize the most vulnerable of human beings—our children.

### IV.

Henderson's application should be dismissed as an abuse of the writ. Because the Court refuses to do so, I dissent.

---

18. 534 U.S. 266, 272–77, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

19. *See also Schlup*, 513 U.S. at 328, 115 S.Ct. 851.

20. 233 S.W.3d 847 (Tex.Crim.App.2007).

21. *Ex parte Easter*, 615 S.W.2d 719, 721 (Tex. Crim.App.1981); *Ex parte Williams*, 703 S.W.2d 674, 677 (Tex.Crim.App.1986); *Ex parte McLain*, 869 S.W.2d 349, 350 (Tex. Crim.App.1994).