

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-76,925

### EX PARTE CATHY LYNN HENDERSON, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS FROM CAUSE NO. 94-2034 IN THE 299TH DISTRICT COURT TRAVIS COUNTY

KEASLER, J., filed a dissenting opinion, in which KELLER, P.J., and HERVEY, J., joined.

### DISSENTING OPINION

Like this Court's order remanding the matter to the trial court for findings of fact and conclusions of law, the Court's opinion today grants Cathy Henderson relief without one word of analysis why she is entitled to it. In fact, the Court does not even identify the legal basis for granting Henderson relief. Instead it issues a legally hollow opinion with a staggering result. Readers of both our remand order in this matter and today's opinion will undoubtedly and justifiably be both baffled and appalled by the Court's opinion. I count myself among them. The unmistakable message of the Court's *per curiam* opinion is this:

despite applicable legal precedent to the contrary and overwhelming inculpatory facts, we grant Henderson relief solely because we want to. And to future applicants, this message's implication is clear: with luck, your writ application may also be viewed with such grace.

In her subsequent application for a writ of habeas corpus, Henderson asserts she is entitled to relief for three reasons: (1) she is actually innocent of capital murder because no reasonable juror would convict her of capital murder in light of new scientific evidence (*Herrera*[1]-type claim); (2) but for constitutional errors—namely a violation of *Ake v. Oklahoma*[2] and a Fifth Amendment claim previously raised and rejected on direct appeal[3]—no rational juror could have found her guilty beyond a reasonable doubt in light of the new evidence (*Schlup*[4]-type claim); and (3) she is no longer death eligible. The Court came to the breathtaking conclusion that Henderson satisfied Texas Code of Criminal Procedure article 11.07, § 5(a) with her allegation that then Travis County Medical Examiner Dr. Roberto Bayardo's reevaluation of his opinion at trial was newly discovered evidence that established her innocence. The Court remanded the matter to the trial court for further proceedings on Henderson's first two claims and dismissed her third.[5]

---

[1] *Herrera v. Collins*, 506 U.S. 390 (1993)

[2] 470 U.S. 68, 83–87 (1985).

[3] *Henderson v. State*, 962 S.W.2d 544, 551–57 (Tex. Crim. App. 1997).

[4] *Schlup v. Delo*, 513 U.S. 298 (1995).

[5] *Ex parte Henderson*, 246 S.W.3d 690, 692 (Tex. Crim. App. 2007).

After several evidentiary hearings, this matter now returns to us with the trial judge's findings of fact and conclusions of law recommending that we grant relief on Henderson's first actual-innocence claim. Dr. Bayardo's reevaluation of whether the injuries suffered by Brandon Baugh, the three-and-half-month-old victim of this capital murder, were intentionally inflicted is the crux of Henderson's actual-innocence claim and the foundation of the trial judge's recommendation to grant relief. Despite our instructions in the remand order, the trial judge did not enter findings of fact or conclusions of law on Henderson's *Schlup* claim, which if the Court were to expressly reject Henderson's actual-innocence claim, as it should, would require remanding to the trial judge to address this issue.

By explicitly stating that the trial judge's findings of fact are supported by the record, the Court, by implication, reaches the opposite conclusion as to the trial judge's conclusions of law—that they do not share the same record support. But it nonetheless "accepts" the trial judge's recommendation to grant relief and give Henderson a new trial on an unknown basis. Surely, it cannot be actual innocence otherwise the Court would have found the trial judge's conclusions are supported by the record or would have expressly found Henderson proved her actual innocence. In its zeal to grant Henderson relief, the Court is forced to look elsewhere to accomplish its goal, and left without a clear legal path, the Court takes the indefensible position to grant relief without justification or explanation. The facts adduced at trial and in the subsequent evidentiary hearings in light of our actual-innocence case law make it clear why the majority could not adopt the trial judge's conclusions and grant

Henderson relief on actual-innocence grounds; the burden is too high, the inculpatory facts are too great, and the "new evidence" is too weak.

To put the issue of Dr. Bayardo's reevaluation in perspective, it is appropriate to start with his testimony at Henderson's 1995 capital murder trial. At the time, Dr. Bayardo had been Travis County's Chief Medical Examiner for eighteen years and throughout his career he had performed approximately 15,000 autopsies. He personally performed Brandon Baugh's autopsy and testified to the extent of Brandon's injuries at trial. Dr. Bayardo concluded, "It is my opinion, based upon the autopsy findings, that the decedent, Brandon Baugh, came to his death as a result of a severe closed head injury. There was comminuted fracturing of the back of the skull and subdural and subarachnoid hemorrhages implying that a severe force had been given to the head and characteristic of abuse, homicide."[6] Dr. Bayardo also concluded that it would have been "impossible" and "incredible" for a fall from four to four-and-a-half feet to have caused Brandon's injuries. He also testified that Brandon's injuries were not accidental because the fractures crossed the suture lines found in an infant's not-fully formed skull which would require a severe degree of force. Further, the injury's location—the back of the head—was a characteristic of an abused child because most accidents occur on the sides of the head. Dr. Bayardo explained that "[t]his is an injury that you see when a baby's head is slammed or thrown very forceable against a flat surface" and in order for Brandon's injury to result from a fall, "he would have to fall from a height

---

[6] 33 R.R. 854.

higher than a two-story building."[7] On cross-examination, Dr. Bayardo conceded that his testimony was limited to the cause of death and he was unable to tell the jury the exact nature of the severe force or how that force was inflicted.

At the habeas hearing and in his affidavit, Dr. Bayardo testified that after reviewing reports from Drs. John Plunkett, Peter Stephens, and Kenneth Monsoon—Henderson's proffered experts who discussed how biomechanics could explain that Brandon's injuries were accidental—he would no longer testify that the manner of Brandon's death was homicide; instead he would now conclude that it was "undetermined," as opposed to accidental. According to his affidavit, Dr. Bayardo also claims that he would not be able to testify about the degree of force needed to cause Brandon's head injury and would not conclude that an accidental fall was "impossible" or "incredible" in explaining the cause of Brandon's injuries.

Even after the benefit of multiple evidentiary hearings where the trial judge took testimony from expert after expert, Henderson is no closer to establishing her innocence than she was in her claims she asserted in her subsequent application.[8] Henderson presents a bare innocence claim. We have labeled the burden of establishing a bare claim of actual innocence a Herculean task.[9] In satisfying this heavy burden, Henderson's newly discovered

---

[7] 33 R.R. 868.

[8] *Ex parte Henderson*, 246 S.W.3d at 696–97 (Keasler, J., dissenting).

[9] *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006); *Ex parte Robbins*, 360 S.W.3d 446, 464 (Tex. Crim. App. 2011) (Price, J., concurring).

evidence must constitute affirmative evidence of her innocence.[10] Henderson must show by clear and convincing evidence that no reasonable juror would have convicted her in light of the new evidence.[11] Whether an applicant satisfies this burden requires the evaluation of "the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, so we must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial."[12]

The trial judge concluded that Henderson "has proved by clear and convincing evidence that no reasonable juror would have convicted her of the capital murder of Brandon Baugh in light of the new evidence presented in her Application."[13] The Court's opinion acknowledges that in most circumstances we appropriately defer to and accept the trial judge's findings of fact and conclusions of law when they are supported by the record. However, we may make contrary findings and conclusion when our independent review of the record reveals the findings and conclusions are not supported by the record.[14] Here, the trial judge's conclusion is not supported by the record and is demonstrably wrong because

---

[10] *Ex parte Franklin*, 72 S.W.3d 671, 678 (Tex. Crim. App. 2002).

[11] *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996).

[12] *Ex parte Robbins*, 360 S.W.3d at 458 (citing *Ex parte Elizondo*, 947 S.W.2d at 206).

[13] Findings of Fact and Conclusions of Law on First Subsequent Application for Post-Conviction Writ of Habeas Corpus at 11, No. 94-2034 (299th Dist. Ct, Travis County, Tex. May 17, 2012) (hereinafter "Findings of Fact and Conclusion of Law").

[14] *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008).

it implicitly mischaracterizes Dr. Bayardo's new opinion, improperly focuses on Dr. Bayardo's reevaluation in isolation, and fails to weigh such exculpatory evidence against all of the evidence of guilt adduced at trial.

Dr. Bayardo's testimony was merely one piece of evidence that established Henderson's guilt at trial and shed light on her intent that fateful day. Henderson was the last one to have seen Brandon the day he went missing after he was dropped off at Henderson's home where she cared for Brandon and Megan Baugh. There were no calls to 911 that day from Henderson's home or from her neighborhood. There were no other pleas for help. She had the Baughs' emergency contact numbers. But they were not called. After Brandon died, she wrapped his body in a blanket and put his body in a Bartles & Jaymes wine cooler box and secured it with tape later matched up to tape found in her home. With Brandon's body in the trunk of her car, Henderson put her daughter Jennifer and Megan, Brandon's older sister, in the car with a spade and her neatly packed suitcase and drove to Round Rock to get her car's oil changed.

On her way out of town and with the two girls in tow, she drove to the bank to withdraw $2200 through a cash advance on her credit card. After repeated attempts proved unsuccessful, she was finally able to withdraw $1000. Henderson told the bank employee that she needed the money because her father just died and she needed to be with her family. At some point in the afternoon, she stopped at McDonald's to get the girls something to eat. She then drove to Holland, Texas where her husband's relatives lived. She arrived

unexpectedly.  They had not seen Henderson in five or six months.  Once there, she told her husband's relatives that she needed to go to the store and would be back soon.  She asked her eleven-year-old niece to babysit Jennifer and Megan.  She never returned.  Instead, she continued north where outside Waco, just off a country road near a stand of trees, she buried Brandon in the box, using the spade she packed.  Investigators would later find Brandon's diaper bag in a ditch in the vicinity where they found Brandon's buried body.

Later that night she checked into a motel in Blackwell, Oklahoma under the name Tracy Simms and listed a Missouri address.  The next day, Henderson arrived in Trenton, Missouri and dropped in on a longtime friend Linda Brewer.  It too was an unexpected visit.  The two discussed Henderson's troubling custody issues and how she was ordered to have only supervised visitation with her other daughter.  Henderson told Brewer that the children she watched were picked up by their grandparents who would take care of them for a week so she decided to visit her in Missouri.  Only three days after Brandon was killed and while having a few margaritas with a friend, Henderson admitted that she had "killed somebody or murdered somebody."[15]

Henderson and Brewer then drove to Independence, Missouri to see other friends.  After her arrival in Independence, Henderson told Brewer that she had a new identity, was getting new licence plates for her car, and wondered how she would look with red hair.  Brewer began to realize Henderson's trip was no longer just an opportunity to come back and

---

[15]  31 R.R. at 347.

visit. When asked why she needed to change her identity, she responded, "I can't do life. I don't want to talk about it anymore." With the use of a Social Security card another friend found, she assumed the identity of Patricia Keith. Reluctant to drive her vehicle because she was afraid the police would be looking for it, she got some old Missouri license plates and put them on her car. She dyed her hair red. With her new identity, she rented an apartment under her assumed name. She also began a sexual relationship with the male friend who gave her the Social Security card and new license plates and wanted him to move in with her. She attempted to find a job in Independence. She did all of this within three or four days after Brandon's death.

When a police officer knocked at the door of her apartment looking for information on Henderson and Brandon, she claimed that she had never seen the person (Henderson) in the pictures. At first, the officer did not recognize her from the pictures. But the officer returned, and Henderson gave a false name. After Henderson consented to a search of the apartment, the officer discovered the Social Security card Patricia Keith's name along with the receipt for the oil change and apartment rental receipt. She was subsequently arrested and claimed that she did not know what this was about, threatened the officers with a false imprisonment suit, and complained that she was going to miss a hair appointment.

She was then interviewed by an FBI agent to whom she gave conflicting stories. Her first story was that she did not have any information about Brandon. In her second story, she claimed that the Baughs' grandmother came to pick Brandon up. She then claimed she

packed up the girls and brought them to the bank, McDonald's, and the relatives' home in Holland and drove to Blackwell, Oklahoma, checking into the motel under Tracy Simms and finally arriving in Trenton and Independence, Missouri. But when the agent suggested that Brandon was dead, and perhaps it was an accident, Henderson said "yes." When asked "Did you bury him?" she responded "Of course, I did. He's just a baby." Henderson's final version was that around 10:30 in the morning, Brandon fell from her arms and hit the tile floor. She stated she attempted CPR for about an hour, but she knew he was dead. She admitted to burying Brandon near Waco with a spade she brought from home.

Dr. Bayardo was not the only witness who gave expert testimony concerning the manner of Brandon's death. The jury heard from Lubbock County Deputy Chief Medical Examiner Dr. Sparks Veasey III. Like Dr. Bayardo, Dr. Veasey concluded that Brandon's injuries were "consistent with a baby's head [being] slammed into a blunt object, a baby being held by the legs and slammed into a wall or a floor. They are consistent with a baby being forcefully—extremely forcefully thrown into a blunt—into a blunt object."[16] He further concluded that Brandon's injuries were inconsistent with an accidental drop from a distance of four to five feet and was certain that Brandon's injuries were not the result of an accident. In addition to Dr. Veasey, Henderson's own expert corroborated Dr. Bayardo's and Dr. Veasey's conclusions. After reviewing the autopsy report, photographs, and videotape, Dr. Kris Sperry, the Fulton County Deputy Chief Medical Examiner in Atlanta, Georgia,

---

[16] 33 R.R. 903.

opined that Brandon's crushing skull fractures were not accidental.

The trial judge's conclusion that Henderson proved by clear and convincing evidence that no reasonable juror would have convicted her of capital murder simply failed to weigh Dr. Bayardo's reevaluation against the evidence of guilt adduced at trial. The trial judge came to the remarkable and unsupported mixed finding and conclusion that

> Because Dr. Bayardo's testimony at trial was the critical evidence upon which the conviction of Applicant rested, and was the testimony upon which the essential element of culpable mental state hinged, the Court finds that if Dr. Bayardo's re-evaluation had been presented to the jury in 1995, no rational juror could have or would have convicted Applicant of capital murder beyond a reasonable doubt in light of this new evidence.[17]

Contrary to Judge Cochran's belief, the trial judge's opinion that "no rational juror could have or would have convicted Applicant of capital murder beyond a reasonable doubt in light of this evidence" is a conclusion of law, and therefore not entitled to deference.

The trial judge claimed to be mindful of Henderson's flight, only to "find[] that the evidence of flight did not have the capacity to prove the *mens rea* of capital murder beyond a reasonable doubt." But "[w]e have repeatedly held that flight is evidence of a circumstance from which an inference of guilt may be drawn."[18] Notably, the trial judge did not hear from Dr. Veasey or Dr. Sperry in connection with Henderson's application and Henderson does

---

[17] Findings of Fact and Conclusions of Law at 7.

[18] *Colella v. State*, 915 S.W.2d 834, 839 n.7 (Tex. Crim. App. 1995) (citing *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989)); *see also Hernandez v. State*, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997); *Valdez v. State*, 623 S.W.2d 317 (Tex. Crim. App. 1981); *Holloway v. State*, 525 S.W.2d 165 (Tex. Crim. App. 1975).

not directly challenge their conclusions. We do not know if their conclusions would change like Dr. Bayardo's when presented with Henderson's experts' affidavits and reports. On this record, we cannot assume they would. However, the trial judge cavalierly found that "if the jurors had heard Dr. Bayardo's re-evaluation, they would not have credited the then-conflicting testimony of Dr. Veasey."[19] Such idle speculation is certainly not a finding that this Court should adopt. Even if true, what about Dr. Sperry's testimony offered by Henderson herself? The findings and conclusions are silent about the potential impact of Dr. Sperry's corroborative testimony of both Dr. Veasey's and Dr. Bayardo's opinions at trial.

More importantly, it is the trial judge's failure to consider all of Henderson's actions after Brandon's death that is the most troubling. After Brandon's death, there was no attempt to call for help. She attempted to hide the evidence of Brandon's death by burying him near Waco with the spade she brought from home. While having drinks with friends she admitted to killing or murdering someone. Further, Henderson did not merely engage in a very deliberate plan to flee. She actively attempted to evade law enforcement through assuming a new identity, changing her appearance, changing her licence plates, and starting a new life in Missouri while leaving her family behind. And when the jig was up, she first claimed not to know what happened to Brandon before finally admitting to burying him and changing her version of events to describe an accidental death. These are not the acts of an innocent person. In the face of common sense and our case law, it would be preposterous to conclude

---

[19] Findings of Fact and Conclusions of Law at 3.

that Dr. Bayardo's new opinion that the manner of death should be undetermined, as opposed to accidental, would undermine all of the incriminating evidence establishing Henderson's guilt.

By leaving its rationale unstated, the Court avoids confronting our holding in *Ex parte Robbins*,[20] our recent opinion addressing a factually similar actual-innocence claim and precedent determinative of Henderson's actual-innocence claim. In *Ex parte Robbins*, Dr. Patricia Moore, an assistant medical examiner, testified at Robbins's capital murder trial that the child victim's death was caused by "asphyxia due to compression of the chest and abdomen and that the manner of death was homicide."[21] Many years after the jury found Robbins guilty of capital murder, Dr. Moore's report and conclusions were reexamined by several other medical examiners who disagreed with her conclusions. Dr. Moore herself also reevaluated her report and came to the conclusion that her opinion had changed and the cause and the manner of the victim's death should be listed as undetermined.[22] Like Henderson, Robbins claimed this reevaluation was newly discovered evidence that demonstrated his actual innocence.[23] In denying Robbin's actual-innocence claim, we held that

> [Robbins] failed to prove that the new evidence unquestionably establishes his innocence. Moore can no longer stand by her trial testimony, but rather than

---

[20]  360 S.W.3d at 458.

[21]  *Id*. at 450.

[22]  *Id*. at 454.

[23]  *See id*. at 457–58.

completely retracting her trial opinion, she is of the current opinion that the cause and manner of death of [the victim's] death are 'undetermined.' Moore cannot rule out her trial opinion as a possibility of how [the victim] died. Hence, Moore's reevaluation falls short of the requisite showing for actual innocence because it does not affirmatively disprove that [Robbins] intentionally asphyxiated [the victim].[24]

Like Dr. Moore's reevaluation in *Ex parte Robbins*, Dr. Bayardo's reevaluation did not render void his trial testimony.[25] The jury could have considered Dr. Bayardo's testimony that the manner of death was "undetermined" and still have found Henderson guilty based on all of the evidence presented at her trial, including Dr. Veasey's and Dr. Sperry's expert conclusions.[26] Henderson's reliance on Dr. Bayardo's reevaluation merely serves to retroactively impugn the State's case at trial and does not affirmatively demonstrate her innocence.[27] On this record and particular claim of actual innocence, we are compelled to follow *Ex parte Robbins* and conclude that Henderson failed to satisfy her Herculean burden—to show by clear and convincing evidence that no reasonable juror would have convicted her in light of Dr. Bayardo's reevaluation.

In its response, the State does not contest the trial judge's findings and conclusions, and does not oppose granting Henderson relief. The State takes this position while simultaneously making it clear that it does not believe that Henderson is not guilty and

---

[24] *Id*. at 458.

[25] *See id*. at 459.

[26] *Id*.

[27] *See id*. at 466 (Price, J., concurring).

disagrees with the biomechanical theory presented by Henderson's experts and relied upon by Dr. Bayardo in his reevaluation. The State's concern for the community's confidence in the criminal justice system expressed in its response is laudable. But it is neither legally controlling, nor a particularly persuasive argument for granting Henderson relief when the State still contests Henderson's underlying factual contentions. The State's acquiescence cannot not bridge the gulf between Henderson's asserted claims and the burden she must satisfy to be legally entitled to relief.

Today, the Court's decision casts aside its established legal principles and grants relief to an applicant not entitled to it. The Court accomplishes this feat by abandoning all standards necessary for an applicant to obtain relief, only to replace them with an unexplained, ad hoc determination. "Because we want to" is not a substitute for legal reasoning. And any suggestion to the contrary is untenable. Further, we have denied past applicants similarly requested relief on similar evidence. We owe a duty to all applicants that we will measure the merits of their claims equally.

Henderson's *Herrera*-type claim of actual innocence should be denied and her pending *Schlup*-type actual-innocence claim should be remanded to the trial court for findings of fact and conclusions of law. It is a travesty to grant this child killer relief on some unknown legal principle while her tiny, defenseless victim lies dead and reburied. Therefore I dissent with all the vigor at my command.

DATE DELIVERED: December 5, 2012

PUBLISH