

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,464

### EX PARTE NEAL HAMPTON ROBBINS, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. 98-06-00750-CR FROM THE
### 410TH JUDICIAL DISTRICT COURT OF MONTGOMERY COUNTY

MEYERS, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, KEASLER, and HERVEY, JJ., joined. PRICE, J., filed a concurring opinion in which MEYERS and HERVEY, JJ., joined. COCHRAN, J., filed a dissenting opinion in which WOMACK and JOHNSON, JJ., joined. ALCALA, J., filed a dissenting opinion.

## O P I N I O N

Applicant was charged with the capital murder of his girlfriend's 17-month-old child, Tristen Rivet. The State's case largely depended on the expert opinion of Dr. Patricia Moore, the medical examiner who performed the autopsy and who testified that Tristen died from asphyxia due to the compression of her chest and abdomen. Applicant was convicted of capital murder and sentenced to imprisonment for life. His conviction

was affirmed on appeal. *Robbins v. State*, 27 S.W.3d 245 (Tex. App.—Beaumont 2000).

We affirmed the judgment of the court of appeals. *Robbins v. State*, 88 S.W.3d 256 (Tex.

Crim. App. 2002). Since that time, Moore has re-evaluated her opinion and has stated

that she can no longer stand by her trial testimony. Applicant filed this application for

writ of habeas corpus, alleging actual innocence and due process claims. The convicting

court entered findings of fact and conclusions of law. We will deny relief.

## I. BACKGROUND

### A. Trial

Applicant was indicted for the capital murder of 17-month-old Tristen Rivet. The

indictment alleged that Applicant did "intentionally and knowingly cause the death of

[Tristen] by asphyxiating [her]."[1] The State elected not to seek the death penalty. The

following facts were developed at trial.

The victim resided with her mother, Barbara Hope, and her mother's boyfriend,

Applicant, at the home of Applicant's mother, Bonni Morris. Applicant and Hope had a

volatile relationship, frequently separating and reuniting. Witnesses suggested that both

suffered from depression. When seeking group-type counseling, Applicant told a

counselor that he did not know what he would do if things got worse, and he feared he

would hurt Hope if they stayed together.

Testimony indicated that Tristen and Applicant had a good relationship, but that

---

[1]The indictment also alleged two enhancement paragraphs, both for September 24, 1993 auto-theft convictions.

changed in the months leading to Tristen's death. Applicant's personality began to change after he started taking pain medication for injuries received in a serious car accident. Then, beginning in November 1997, Tristen suffered injuries on three separate occasions while being cared for by Applicant: a bruise under the eye, an injury to her leg or ankle, and finally, a series of bruises across her face. Also, testimony suggested that in early 1998, Tristen became afraid of Applicant. Hope stated that Tristen "didn't seem to care too much for [Applicant] anymore" and seemed afraid of him. Tristen's injuries and change in behavior led neighbor Rhonda Bethune and babysitter Helen McDaniel[2] to express concern that Applicant was hurting Tristen. However, the defense presented several witnesses, including Morris and Applicant's grandmother, brother, and sister-in-law, who stated that Tristen and Applicant had a very loving, father-daughter type of relationship.

On the morning of her death, Tristen was suffering from a cold but was otherwise in good health. Hope, accompanied by Morris, left the house at approximately 11:30 a.m. to attend appointments and run errands. Applicant was entrusted with Tristen's care. Applicant's parole officer, Tim Hurst, visited Applicant between 1:26 p.m. until 2:00 p.m. Hurst testified that he observed Tristen walking around and eating animal crackers, and Tristen asked for some red punch, which Applicant gave her from his own glass.

---

[2]McDaniel testified that she called CPS regarding Tristen's injuries, but the agency did not follow up on the case. She also claimed that she left town because she was so scared of Applicant.

Applicant's brother arrived for a visit at approximately 1:45 p.m. and remained at the home until about 2:20 p.m.

Applicant paged Hope between 3:30 and 4:00 p.m. When Hope called, Applicant sounded "shaky" and "excited" and told her to hurry back to the house because he "had to go and had things to do." When Hope and Morris arrived home between 4:00 and 4:30 p.m., Applicant told them that he had laid Tristen down for a nap shortly after they spoke on the telephone. Applicant stated that he had to leave, and an argument ensued with Hope about Applicant's frequent absences. Applicant and Hope walked to the store a couple of blocks away and then returned home. During that time, Morris was alone with Tristen. She testified that she was going through bills and talking on the phone, as could be supported by phone records.

After Applicant departed, Hope watched a news broadcast on television. At about 5:40 p.m., Hope checked on Tristen and thought that the child was sleeping. At 6:00 p.m., Hope returned to Tristen's room to wake her up. She saw that the baby was lying in her bed with a pillowcase covering one eye, part of her nose, and her mouth. When Hope moved the pillowcase, she saw that Tristen's lips were blue. Upon picking her up, Hope found that Tristen's body was cold and that she was not breathing.

Hope cried for Morris to call 9-1-1 for assistance and carried Tristen into the living room. There she held Tristen on her lap and tried to breath into her mouth. A pink fluid gurgled up from Tristen's mouth and nose, and Hope inserted a finger into Tristen's

throat to attempt to dislodge any object stuck in her throat. Hope then carried Tristen outside, where she yelled for someone to assist her and placed the child on a patch of well-groomed lawn near the front door. Morris and a neighbor's daughter, Pamela Garrison, attempted to perform CPR on Tristen. Morris blew into Tristen's mouth while Garrison pushed with very little force upon the child's abdomen three or four times, using the palm of her hand. Garrison testified that Tristen's skin felt very cold, and she did not hear any air coming out of the baby. Another neighbor, Jackie Sullivan, who had previously worked as an emergency medical technician, approached and told Morris and Garrison to stop because they were performing CPR too forcefully, given the size of the child. Sullivan made a statement to the effect that they would kill the child if she was not dead already. She observed that Tristen was not breathing, that her body was cold, and that her lips were bluish-purple, circumstances leading her to believe that Tristen was dead at that time. Still, Sullivan started to perform infant CPR with two fingers.

An ambulance arrived at 6:08 p.m., and paramedic Elizabeth Fredregill placed Tristen on a stretcher. After several unsuccessful attempts, a breathing tube was inserted into Tristen's larynx. Fire department personnel performed CPR and administered epinephrine during the trip to the hospital. Fredregill observed that Tristen was pale and cold to the touch, that her neck was stiff, and that there was vomit in her airway, and she formed an opinion that Tristen was dead based on her observation of fire department personnel performing CPR. The first base-line EKG was taken in the ambulance at 6:16

p.m.

Tristen arrived at the hospital at 6:36 p.m., and she was immediately examined by Dr. John Conner, who determined that Tristen was "asystole" and without respiration, was cool to the touch, and displayed some dependent lividity, all indicating that she "had been dead for some time." Tristen was placed on monitors to assess her condition, but Conner believed that there was no chance of successful resuscitation. A nurse attempted to determine Tristen's temperature with a rectal thermometer, which continued to display its lowest possible reading of 94 degrees Fahrenheit, thereby signifying that the child's temperature was actually lower than the minimum displayed by the digital thermometer. Conner pronounced Tristen dead at 6:53 p.m. He broke the news to Hope, who was distraught and cried that she did not want to live. Conner testified that Applicant's behavior was unusual in the situation because he attempted to fondle Hope, but other witnesses disputed this testimony.

Subsequently, Justice of the Peace Edie Connelly ordered an autopsy that was performed by the Harris County Medical Examiner's Office (HCMEO), specifically assistant medical examiner Dr. Patricia Moore. Moore noted six or seven contusions on Tristen's legs, which were consistent with normal childhood injuries. She also observed five irregularly shaped, purple bruises on Tristen's back, ranging from one-eighth to one-quarter inch in width; bruises on the right side of her neck; and areas of discoloration on her face and left arm. Moore incised the bruises on Tristen's back with a scalpel and

found hemorrhages down to the level of deep subcutaneous tissue. When examining Tristen's internal organs, Moore discovered petechiae (small areas of hemorrhage) on the thymus and the lungs, a small hemorrhage on the kidney, a recent hemorrhage between the intracostal muscles of the eleventh and twelfth ribs on each side, and a hemorrhage of the tonsils. Moore stated that Tristen's heart appeared "pretty good" and the lungs contained "some mucus in the bronchi," which probably resulted from a cold. Upon further examination the next day, Moore found two additional bruises behind Tristen's right ear and another bruise on the right side of her neck.

At trial, Moore, as the State's expert witness, testified that the cause of Tristen's death was asphyxia due to compression of the chest and abdomen and that the manner of death was homicide. She explained that the presence of petechiae on the back of the thymus and lungs indicated an asphyxia-related death. Moore ruled out CPR as the cause of death because the injuries to Tristen's back were inconsistent with the administration of adult CPR and the injury to the kidney was deep down, requiring a lot of force. She also excluded sudden infant death syndrome (SIDS) because of the child's age "and the story doesn't fit the picture of a SIDS baby death." Additionally, Moore stated that Tristen may have been dead for at least three hours before her temperature was taken at the hospital, based upon an approximate post-mortem cooling rate of 1.5 degrees per hour, and that Tristen's body would not have sustained bruises as the result of the application of CPR that long after her death.

On cross-examination, Moore testified that she was assuming that the CPR took place on the floor, so Applicant asked her to imagine that it took place on a floor with sticks and rocks scattered around and that the adults performing CPR were doing so as if Tristen was a strong adult and were applying heavy force on her chest and abdomen. Moore responded that such circumstances could explain the bruises on the back but not the rib injury (although she also acknowledged that if enough pressure was applied to the abdomen, the kidney and ribs could bruise). Moore also asserted that she was not completely excluding other reasonable hypothesis by which Tristen died. Still, it was her opinion that Tristen was asphyxiated, and she believed that beyond a reasonable doubt.

To contravene Moore's testimony, the defense called Dr. Robert Bux, the deputy chief medical examiner for Bexar County, Texas.[3] Bux testified that the cause of Tristen's death could not be determined and that no anatomical reason demonstrated during the autopsy could have led to a specific cause of her death. Relying on a treatise, Bux explained that death from asphyxia by compression would have resulted in abundant petechiae above the level of compression (including on the forehead, cheeks, and eyes) as well as abrasions and bruises around the front of Tristen's body that would have occurred during the struggle. But Moore observed none of these during the autopsy. Bux also stated that the occasional petechiae on internal organs observed were a "non-specific finding" and could have resulted from other causes. That is, "[e]ven the presence of

---

[3]Bux agreed that SIDS does not apply to this case. He also noted that Tristen did not die from poisoning, as per the toxicology report.

abundant petechiae is not a hallmark" and was not "specific for asphyxia." Regarding the time of death, Bux stated that pulseless electrical activity on Tristen's EKG charts could have occurred 30 to 40 minutes after her death, indicating that Tristen's death occurred after 5:30 p.m. when Applicant was not with the baby. When asked about the role of CPR in the injuries, Bux asserted that the bruises on Tristen's back were consistent with the administration of CPR while the child was lying on a lawn that was not prepared for that purpose. Similarly, Bux testified that the rib and kidney injuries could have been caused by frontal pressure during CPR, although he admitted that he had not personally seen a kidney injury due to such occurrence. Bux claimed that bruises can occur after death, explaining that it is possible for there to be a distribution of blood vessels and then the blood runs out and pools because of gravity.

In its rebuttal case, the State offered evidence to contradict Bux's EKG testimony. Fredregill described how the electrodes are attached and the advantages of electrodes over other types of monitors. Kelly Curry, Fredregill's supervisor and the clinical manager for EMS at Montgomery County Hospital District who was trained in and also taught how to read EKGs, testified about interference and artifacts in EKG readings. She explained that the three electrode leads attached to Tristen looked at different directions of the heart and were to be read simultaneously. She dismissed as artifacts any activity on the EKG charts because no organized activity was represented and not all of the leads showed it. One reading did show some movement, but she attributed it to the CPR that

was in progress, not heart activity. Finally, Carl Ulbrich, a physician who was working in the emergency room at the same time as Dr. Conner but was not the primary physician on Tristen's case, reviewed the records and testified that the EKG readings indicated no electrical activity except for mild interference. He noted that the up-and-down pattern on one of the EKG charts was consistent with CPR.

Applicant testified in his defense. He stated that Tristen was affectionate toward him and that on the day of her death, he did nothing to harm Tristen. In fact, he claimed that he had never struck her, abused her, disciplined her, or even raised his voice to her. Yet he admitted causing the three injuries to Tristen, blaming the incidents on his "carelessness." When asked about his turbulent relationship with Hope, Applicant denied that any stress resulted from the fact that Hope came in and out of his life, and although he participated in group counseling with her, he denied being depressed, claiming he attended merely out of concern for Hope. Applicant further commented that he would overlook a lot of things because of his love for Tristen. In addition, Applicant was questioned about the testimony of Bethune that in the month following Tristen's death, Applicant took all of the batteries out of Tristen's toys and then explained to her that "it hurt too much; he couldn't handle the guilt." Applicant responded that he removed the batteries because it hurt him to hear them go off, not due to a feeling of guilt from something that he had done.

During closing arguments, the State emphasized Moore's testimony in arguing that

it was Applicant, and only Applicant, who could have caused the asphyxia-related death of Tristen. For his part, Applicant argued that if "anything, he is guilty of the offense of loving a child." Applicant put forth the SIDS scenario and emphasized that the bruises on Tristen's body could have been caused by incorrectly performed CPR efforts to save her life. He also pointed to the testimony of the two medical examiners, arguing that Bux's was the more credible opinion.

On February 22, 1999, the jury found Applicant guilty of capital murder, and Applicant was sentenced to life imprisonment. Approximately a month later, Applicant filed a motion for new trial, arguing that evidence was legally and factually insufficient to establish that Tristen's death was a homicide, but the trial court denied the motion.

## B. Beaumont Court of Appeals

Applicant argued on appeal, inter alia, that the evidence was legally and factually insufficient to establish that he caused Tristen's death. The court of appeals rejected Applicant's arguments and affirmed the conviction. *Robbins v. State*, 27 S.W.3d 245 (Tex. App.—Beaumont 2000). In overruling Applicant's legal-sufficiency claim, the court of appeals explained that the State presented evidence such that a "rational trier of fact could find [Applicant] committed capital murder as alleged in the indictment." *Id*. at 247-48. For the factual-sufficiency claim, the court of appeals noted that Applicant developed alternative theories that either Hope intentionally killed Tristen after Applicant left the home or the women accidentally killed the child while trying to revive her from an

unexplained coma, and the court concluded that the "evidence supporting these alternate hypotheses is not so overwhelming that [it] could conclude that the verdict is contrary to evidence." *Id.* at 249.[4]

### C. Court of Criminal Appeals

We granted a petition for discretionary review to determine whether the trial court properly admitted evidence of previous injuries that Tristen suffered while she was in Applicant's care.[5] We affirmed the court of appeals. *Robbins v. State*, 88 S.W.3d 256 (Tex. Crim. App. 2002).

We first rejected Applicant's Rule 404(b) claim that the relationship evidence was improperly admitted to show intent or absence of accident because his plea of not guilty did not put his intent at issue. *Id.* at 259-62. While his plea alone did not put his intent at issue, Applicant "went beyond simply pleading not guilty through vigorous cross-examination of the prosecution witnesses suggesting that the victim's death was caused by some means other than [his] intentional act." *Id.* at 261. Therefore, we determined it

---

[4]Applicant also unsuccessfully raised a *Batson* challenge and argued that the trial court improperly denied a mid-trial request for a limited instruction regarding a burden of proof. *Robbins*, 27 S.W.3d 249, 251. The remaining points of error referred to evidence of extraneous injuries sustained by Tristen while in Applicant's care, "offered by the State as evidence of the prior relationship" between them. *Id.* at 249-50. The court of appeals held that the evidence was relevant under Rule 401 because it related to Applicant's state of mind and the absence of an accident; admissible under Rule 404(b) because it was "probative of intent and lack of accident," rather than character conformity; and not "unfairly prejudicial" under Rule 403 because "the prejudicial effect lies in its probative value rather than an unrelated matter." *Id.*

[5]We referred to this as "relationship evidence." *Robbins*, 88 S.W.3d at 258.

was "at least debatable" whether Applicant's intent was at issue, and the trial court would not have erred in finding that the relationship evidence was relevant to Applicant's intent or to "the noncharacter conformity purpose of rebutting [Applicant's] various defensive theories." *Id.* at 261-262.

We then overruled Applicant's Rule 403 argument that the relationship evidence's probative value was substantially outweighed by the danger of unfair prejudice. *Id.* at 262-63. We determined that the relationship evidence, though prejudicial, was not "unfairly prejudicial." *Id.* at 263. "[T]here was no reason to believe that the jury had a reasonable doubt for [Applicant's] guilt of the charged offense but convicted [him] based on the relationship evidence." *Id.*

## D. Reevaluation of Autopsy Findings

In March 2007, an acquaintance of Applicant contacted the HCMEO and asked it to review Moore's findings regarding the cause of Tristen's death. The deputy chief medical examiner for Harris County, Dr. Dwayne Wolf, undertook a re-evaluation of the autopsy findings. After reviewing the testimony adduced during Applicant's trial, the autopsy report, the EMS and medical records, and the police offense report, Dr. Wolf concluded that Moore's observations during the autopsy did not support a finding that the death resulted from asphyxiation by compression or from any other specific cause. Consequently, on May 2, 2007, Wolf amended Tristen's autopsy report to reflect that both the cause and manner of death was "undetermined." And so on the following day, Justice

of the Peace Edie Connelly formally reopened the inquest into Tristen's death.

Shortly thereafter, former Harris County Medical Examiner Joye Carter was asked by the Montgomery County District Attorney's Office to review Moore's autopsy report. Carter had been Moore's supervisor and had agreed with Moore's original opinion. In a May 10 letter to the district attorney, she wrote, "Upon my review of this case I would not concur with the opinion on the manner of death as a homicide but would reconsider this case as an undetermined manner," and "If the Harris County Medical Examiner intends to re-rule this case as an undetermined manner of death I would agree with that change."

Moore, too, was asked by the Montgomery County District Attorney's Office to review her autopsy report. In a May 13 letter to the district attorney, she stated,

> I believe that there are unanswered questions as to why the child died, and I still feel that this is a suspicious death of a young child. Given my review of all the material from the case file and having had more experience in the field of forensic pathology, I now feel that an opinion for a cause and manner of death of undetermined, undetermined is best for this case.

Moore explained that since her original opinion, she has had more experience, and she has reviewed additional information that suggested that the bruises could have resulted from aggressive CPR and other efforts to assist the child.[6] She emphasized that it was

---

[6]Although Moore claims that she was previously unaware that "'aggressive' adult type CPR was performed by persons untrained in CPR (infant) on this 17 month child" and that "CPR was performed on a manicured lawn," she was cross-examined about such circumstances at trial. Similarly, she asserted that she has learned since her original opinion that "a finger was placed in the child's mouth to possibly clear the airway and that back blows were done on the child prior to EMS arrival," but these facts were available to Moore, as they were facts obtained during the investigation into Tristen's death and were presented at trial.

significant that aggressive adult-type CPR by untrained persons was performed on Tristen, a 17-month-old child.

### E. Habeas Application and Proceedings

On June 4, 2007, Applicant filed his original application for a writ of habeas corpus alleging, "Newly discovered evidence shows that no rational juror would find Applicant guilty beyond a reasonable doubt of the offense for which he was charged and convicted." About a month later, Applicant filed a supplemental application alleging that his "right to a fair trial by a fair and impartial jury . . . was violated because his conviction was based on testimony material to the State's case that has now been determined to be false."

In its original response on June 25, 2007, the State recommended that Applicant be granted a new trial because his due process rights to a fair trial and impartial jury were violated. The State claimed that because it relied on Moore's original opinion in presenting its case, which has now been recanted, confidence in the outcome has been undermined. Citing *Ex parte Carmona*, 185 S.W.3d 492 (Tex. Crim. App. 2006), the State wrote, "While Dr. Moore's testimony is not perjured testimony, the effect of the change in her opinion is the same--the jury was led to believe and credit facts that were not true."

The same day, Applicant and the State filed agreed findings of fact and conclusions of law. But instead of signing them, on August 22, 2007, the trial court

appointed Dr. Thomas Wheeler, the Chairman of the Department of Pathology at Baylor College of Medicine, with the task of conducting an independent pathological examination to address the following issues: (1) What is the manner of Tristen Rivet's death? (2) What is the means of Tristen Rivet's death? (3) Are the manner and means of Tristen Rivet's death able to be determined? (4) Does a change in the medical examiner's opinion about the manner and means of Tristen Rivet's death entitle Applicant to a new trial? After reviewing the autopsy file of the victim, trial testimony, and exhibits, Wheeler concluded in a September 18, 2007 letter to the trial court that the cause and manner of Tristen's death were undetermined. Wheeler asserted that "[a]lthough the autopsy performed by Dr. Moore was thorough and well documented, her conclusion that the death of Tristen Rivet was caused by asphyxia secondary to chest compressions was not justified by the objective facts and pathological findings in this case." He could not rule out suffocation or asphyxiation as the cause of death, but he did not see any physical findings that would support any particular conclusion as to the cause of death.

In October 2007, Judge Connelly ordered that pathologist Linda Norton conduct an independent forensic examination of the evidence and submit a written report of her findings and opinion on the cause and the manner of Tristen's death.[7] On March 28, 2008, Norton reported the results of her review during a recorded telephone conference call, in which Judge Connelly and counsel for Applicant and the State participated.

---

[7] Norton was paid $22,907.50 from Montgomery County general funds, the district attorney's forfeiture account, and funds budgeted to the sheriff's cold case investigation squad.

Norton stated that it was her opinion that Tristen's death was a homicide and that the manner of death was asphyxia by suffocation.  She explained that her conclusion was supported by the petechial hemorrhages on Tristen's lungs and thymus, combined with the other evidence of trauma, and in the context of the other circumstances of Tristen's death.  In addition, Norton stated that the correct rule of thumb for assessing temperature loss in a child's body after death is an approximate loss of three degrees per hour, depending upon ambient temperature and other environmental facts.  Thus, combining that with Tristen's maximum rectal temperature of 94 degrees at the hospital and the descriptions of Tristen's condition by Sullivan and others, she believed that Tristen's death occurred between 2:30 and 5:00 p.m.  Consequently, because the child had been dead for at least an hour before CPR was attempted, the external bruises observed during the autopsy could not have been inflicted during the CPR.  Nonetheless, Norton acknowledged that she could not conclude beyond a reasonable doubt that Applicant and Applicant alone committed the homicide.

Norton also recommended that authorities investigate reports that Applicant had written something on a dollar bill and placed it in Tristen's casket at the funeral home on the date of Tristen's funeral.  Ruth Hope (Barbara Hope's mother) and Shelby Becker (Barbara Hope's sister) had executed affidavits indicating that they saw Applicant writing something on a money bill and then placing it in Tristen's coffin.  On April 4, 2008, Judge Connelly signed an order directing that Tristen be exhumed for the purpose of

retrieving any evidence that might be found in the casket. Six days later, Tristen's remains were exhumed and remnants of a piece of paper resembling United States currency were recovered from the casket liner. Document preservation experts reported on May 6, 2008, that no markings of any kind could be identified due to the poor condition of the paper.

Judge Connelly amended Tristen's death certificate on May 13, 2008, to correspond with Norton's opinion that Tristen's death was caused by asphyxia due to suffocation, rather than asphyxia by compression; the homicide finding was not changed. The following day, Norton executed an affidavit incorporating her conference discussion. In its May 27, 2008 supplemental response, the State was no longer willing to recommend a grant, but it agreed not to oppose Applicant's request for a new trial. It wrote that the "cause of death remains asphyxiation, albeit by suffocation rather than compression, and the manner of death a homicide as presented by the jury at Applicant's trial." On August 6, Wheeler submitted a sworn affidavit, repeating what he had said in his September letter to the trial court, adding that he disagreed with Norton's opinions. That same day, Applicant filed a memorandum on why Moore's amended autopsy should not be found credible.

On August 13, 2008, Applicant, joined by the State, filed proposed joint findings of fact and conclusions of law, which recommended that Applicant be granted a new trial based on due process grounds and the fact that he was denied a "fundamentally fair trial

and an accurate result." On August 25, Moore's sworn affidavit was filed, incorporating much of her prior letter to the district attorney. The next day, Applicant, again joined by the State, filed another set of proposed findings and conclusions. Instead of signing it, the trial court ordered that the parties engage in discovery. Moore was deposed on December 10, 2008; Wheeler on December 19, 2008; and Wolf on February 10, 2009. The trial court appointed John Milutin, an attorney experienced in the deposition of medical experts, to depose these witnesses. Norton was subpoenaed so she, too, could be deposed, but she could not be located. When the trial court granted the State's motion to depose Norton at the location of her choosing, she could not be deposed due to medical problems.[8] Instead, on December 17, 2009, Norton submitted a second affidavit in which she confirmed that she was incapable of preparing for or participating in a deposition, and she adopted and ratified under oath the statements and opinions she expressed during the previous telephone conference, including that she believed Tristen died from suffocation and that her death was homicide. Based largely on Norton's opinion, on December 22, the State filed its second supplemental response and recommended that relief be denied. Shortly thereafter, Applicant filed an objection to Norton's affidavit, arguing that, given

---

[8]Norton's daughter informed the State that Norton's office administrator and close personal friend had died of an apparent self-inflicted gunshot wound at the residence she shared with Norton. Subsequently, Norton suffered from an unspecified health problem that required a "leave of absence" from her medical practice. When the court ordered that the parties take the deposition at a location of Norton's choosing, Norton had closed her office and vacated her home, so she could not be located by the investigator who sought to serve her with a copy of the court order. Norton then informed counsel by telephone that she was under a doctor's care and could not currently be medically cleared to participate in a deposition.

her unwillingness to be deposed, the trial court should not consider her affidavit.

On December 29, 2009, Judge Connelly conducted an evidentiary hearing on Applicant's motion to reopen the inquest into Tristen's death to allow consideration of additional expert medical testimony. Applicant also filed a motion to reopen the inquest into Tristen's death after her death certificate was amended to show she died of suffocation, but this motion was denied because "on the basis of examination and investigation, in the opinion of this Court, the cause and manner of the death of Tristin Skye Rivet, as shown on the amended death certificate . . . , is cause: asphyxia due to suffocation, manner: homicide."

On January 15, 2010, the State filed its proposed findings of fact and conclusions of law, which recommended that relief be denied. Days later, Applicant filed his proposed findings and conclusions. On January 21, the State filed its first supplemental brief in support of its proposed findings and conclusions. While not willing to concede that Applicant properly raised a due process claim in his supplemental ground for relief, the State argued that, even if he did raise due process, the Court "has not yet held—and it seems unlikely that it will ever hold—that the Due Process Clause is violated when a witness provides, in good faith, an opinion that is believed to be *true* by both the witness and the prosecution at the time of trial, even if that opinion is subsequently challenged by other experts or reconsidered by the witness who offered it."

The next day, on January 22, 2010, the trial court permitted oral argument.

Applicant argued that Moore's re-evaluation was newly available evidence and that *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996), requires that the newly available evidence be evaluated within the four corners of the trial transcript.[9] Further, Applicant asserted that due process and fairness require that the jury have the opportunity to re-weigh the evidence. In contrast, the State contended that Applicant could not establish that he was actually innocent because the evidence is not newly discovered, the re-evaluation was not indisputable, and there was other evidence of Applicant's guilt. Regarding the due process claim, the State argued that Applicant had failed to raise it as a supplemental ground, and it doubted whether there was a legal and factual basis for his due process claim: "It's hard to believe that a violation of due process is established by evidence that an expert opinion may have been correct or it may have been incorrect."

The trial court made twenty-two pages of detailed findings of fact, much of which is summarized above, and five pages of conclusions of law. The trial court recommended that we grant Applicant a new trial because his due process and due course of law rights were violated, as was his right to an impartial jury. But it recommended that we deny Applicant's actual innocence claim. In a post-conviction review of a writ of habeas corpus, this Court is the ultimate factfinder. We are not bound by the findings and conclusions of the convicting court, but we generally defer to such if they are supported

---

[9]Applicant stated that by "false evidence," he meant evidence that is "interchangeable with discredited, inaccurate, incorrect, unvalid, unfounded, whatever term of art this Court chooses to use." He further noted that Moore's change of opinion was not a recantation but instead a reevaluation, so it deserved more deference.

by the record.  *See, e.g., Ex parte Chabot*, 300 S.W.3d 768, 772 (Tex. Crim. App. 2009);

*Ex parte Thompson*, 153 S.W.3d 416, 417-18 (Tex. Crim. App. 2005).

## II. ACTUAL INNOCENCE

Applicant contends in his original ground for relief that "[n]ewly discovered

evidence shows that no rational juror would find Applicant guilty beyond a reasonable

doubt of the offense for which he was charged and convicted."

### A. Caselaw

Although a strong presumption of finality to a criminal conviction exists, it must

sometimes yield so that a "fundamentally unjust incarceration" may be corrected.  *Ex*

*parte Franklin*, 72 S.W.3d 671, 678 (Tex. Crim. App. 2002).  Still, any person finally

convicted in a fair trial cannot wage a collateral attack "without making an exceedingly

persuasive case that he is actually innocent."  *Ex parte Elizondo*, 947 S.W.2d 202, 206

(Tex. Crim. App. 1996).

We have recognized that a claim of actual innocence is cognizable in a post-

conviction habeas corpus proceeding.  *Elizondo*, 947 S.W.2d at 205.  There are two types

of actual innocence claims that may be raised.  One is a *Herrera*-type claim or a bare

claim of actual innocence.  *Id.* at 208.  It is a substantive claim in which the applicant

argues his innocence based solely upon newly discovered evidence, evidence that was

neither introduced at trial nor available to the defense to introduce at trial.  *Id.*  Because

this attacks the conviction directly, an "extraordinarily high" standard applies.  *Id.* at 209;

*see Schlup v. Delo*, 513 U.S. 298, 315-16 (1995). The second type is a *Schlup*-type claim, which is accompanied by a claim of constitutional error. *Schlup*, 513 U.S. at 314. The applicant's claim of innocence does not provide a basis for relief by itself.

### B. Application

Applicant presents a bare innocence claim, relying on the newly available evidence of Moore's re-evaluation. In assessing Applicant's claim, we look to see whether there is "clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." *Elizondo*, 947 S.W.2d at 209. We evaluate "the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, [so] we must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial." *Id.* at 206; *see Ex parte Thompson*, 153 S.W.3d at 417.

The convicting court concluded that Applicant has failed to meet the burden of showing his actual innocence and recommended that this Court deny relief based on this ground. Because we find support in the record, we agree with the convicting court.

Even assuming that Moore's re-evaluation was previously unavailable, Applicant has failed to prove that the new evidence unquestionably establishes his innocence. Moore can no longer stand by her trial testimony, but rather than completely retracting her trial opinion, she is of the current opinion that the cause and manner of Tristen's death are "undetermined." Moore cannot rule out her trial opinion as a possibility of how Tristen died. Hence, Moore's re-evaluation falls short of the requisite showing for actual

innocence because it does not affirmatively disprove that Applicant intentionally asphyxiated Tristen.

Our conclusion is evident when Moore's opinion of "undetermined" is placed in the context of the trial record, including Bux's "undetermined" opinion (which the jury heard at trial and did not believe) and the non-medical evidence. For example, Applicant and Hope had a stormy relationship, which led both to seek counseling. Applicant evidenced a personality change that accompanied his use of pain medication in the months preceding Tristen's death. Tristen became afraid of Applicant, cowering in his presence, and suffered at least three injuries when in Applicant's sole care.[10] Applicant was alone with Tristen for much of the day, and she was in good health when visitors stopped by the house. Applicant seemed to be in a rush to leave the house when Hope returned home. Despite Tristen's general good health, she died suddenly. Applicant spoke of feelings of guilt while subsequently discussing Tristen's death, and her toys, with a neighbor. In all, when the newly available evidence is viewed in the context of the inculpatory evidence in the trial record, it cannot be said that Applicant's innocence has been unquestionably established because a juror could reasonably conclude that Applicant intentionally asphyxiated Tristen.

The case at hand is distinguishable from our leading actual innocence case of *Elizondo*, 947 S.W.2d 202. There, the applicant's conviction was based solely on the

---

[10]As we stated previously, the jury could consider this relationship evidence as evidence of absence of accident and evidence of Applicant's intent. *See Robbins*, 88 S.W.3d at 259-62.

victim's testimony; no other incriminating evidence was offered at trial. *Id.* at 209-210.
The victim later recanted his trial testimony, claiming that it was entirely false, and we
concluded that there was clear and convincing evidence "that another jury hearing the
[newly available] evidence . . . would view the new evidence as the more credible and
would acquit applicant." *Id.* at 210. The recantation "not only void[ed] his trial
testimony which implicates applicant, but constitute[d] affirmative evidence of
applicant's innocence." *Id.*

Unlike the witness in *Elizondo*, Moore did not entirely repudiate her testimony.
Although she can no longer stand by her more definite trial testimony, it remains at least
possible that Tristen's death could have occurred as Moore originally testified. Thus,
Moore's re-evaluation does not void her trial testimony. The jury could have considered
Moore's "undetermined" opinion and still found Applicant guilty, especially in light of all
of the other evidence adduced at trial. Applicant has, therefore, failed to make the
requisite threshold showing "by clear and convincing evidence that no reasonable juror
would have convicted him in light of" Moore's re-evaluation. *See id.* at 209.

### III. FALSE TESTIMONY AND DUE PROCESS

Applicant alleges in his supplemental ground for relief that his "right to a fair trial
by a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the
United States Constitution, and Art. I, Sec. 10, of the Texas Constitution, was violated
because his conviction was based on testimony material to the State's case that has now

been determined to be false."

## A. Caselaw

The Due Process Clause of the Fourteenth Amendment can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly[11] or unknowingly[12]. Accordingly, to constitute a due process violation, the testimony used by the State must have been false, and it must have been material to the defendant's conviction, meaning "there is a reasonable likelihood[13] that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103-04 (1976); *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011).

The case law in this area frequently refers to the use of perjured testimony, but it is sufficient that the testimony was "false." *Napue*, 360 U.S. at 269. There is no need to show that the witness committed perjury, although whether the testimony is perjury or was knowingly used may impact the applicable standard of materiality. *Ghahremani*, 332 S.W.3d at 478. We have explained that "'[t]estimony that is untrue' is one of many ways jurists define false testimony [and the] Supreme Court has indicated that 'improper suggestions, insinuations and, especially, assertions of personal knowledge' constitute

---

[11]*Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935); *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011).

[12]*Ghahremani*, 332 S.W.3d at 478; *Estrada v. State*, 313 S.W.3d 274, 278-88 (Tex. Crim. App. 2010); *Chabot*, 300 S.W.3d at 771.

[13]We have also used the language of "more likely than not" in lieu of "reasonable likelihood." *See Chabot*, 300 S.W.3d at 772.

false testimony." *Ex parte Chavez*, No. AP-76291, 2010 WL 4638619, at \*7 (Tex. Crim. App. Nov. 17, 2010) (not designated for publication) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935) and BLACK'S LAW DICTIONARY 1485-86 (7th ed. 1999)).

## B. Application

Applicant alleges that Moore's trial testimony was false. The convicting court, in its conclusions, determined that "[t]he verdict was not obtained by fair and competent evidence, but by admittedly false testimony that was unsupported by objective facts and pathological findings and not based on sufficient expertise or scientific validity." We disagree with the convicting court because the record does not support its conclusion.

At trial, Moore testified that it was her professional opinion that the cause of death was asphyxia-related compression of the chest. In explanation, Moore relied heavily on the petechiae found on the thymus and lungs, which indicated some type of asphyxia, and the small hemorrhage on the kidney, which suggested some type of injury. On cross-examination, she acknowledged that she was not completely excluding other reasonable hypothesis by which Tristen died. Rather, it was her opinion beyond a reasonable doubt that Tristen's death was due to homicide by asphyxiation.

Moore has since changed her position and stated that she can no longer stand by the position to which she testified.[14] In her sworn affidavit, she asserted, "I now feel that an opinion for a cause and manner of death of undetermined, undetermined is best for this

---

[14]There is no allegation that Moore committed perjury or was aware of any lack of scientific support for her trial testimony regarding the cause of the victim's death.

case;" yet, she felt that "this is a suspicious death of a young child." During her deposition, Moore affirmed that she "could no longer testify within a reasonable degree of medical certainty that the complainant's death in this case was the result of compression asphyxia" or "that the [manner] of death in this case was homicide." Still, she could not exclude such cause and manner of death, particularly because "the diagnosis of asphyxial death . . . relies on investigations since anatomic findings are typically subtle or absent." She maintained that the cause and manner of Tristen's death should now be considered undetermined:

> Q. . . . So nothing about that would tell you that this baby's manner of death was homicide from what you -- what you found on autopsy?
>
> A. Well, back then I did believe that the bruising on the back and the chest compressions was what caused the baby; so, I believed that was caused by another person. That's what I believed back then, but I don't believe that now.
>
> Q. What do you believe caused it now?
>
> A. I'm not sure.
>
> Q. What do you believe caused it? I'm not asking what you're sure of.
>
> A. I don't know.

We believe that the record does not support that Moore's trial testimony has been proven to be false. Although Moore played an important role in the State's case as the only trial witness to point to a specific cause of Tristen's death, Moore's trial testimony is not false just because her re-evaluation of the evidence has resulted in a different, "undetermined" opinion, especially when neither she nor any other medical expert can

exclude her original opinion as the possible cause and manner of death.

This case is similar to our recent unpublished opinion of *Ex parte Chavez*. There, a criminalist testified at trial that an unknown hair from tape lifted at the victim's residence shared similar physical characteristics with the defendant's known hair sample, but she could not positively identify the unknown sample. *Chavez*, 2010 WL 4638619, at *7. The similarities of the physical characteristics of the unknown hair and defendant's known hair sample were not refuted, but subsequent DNA testing excluded defendant as a source of the unknown hair. *Id*. We held that, even with the new DNA results, the criminalist's testimony was not false. *Id*.

Here, similar to the criminalist's testimony that she could not positively identify the sample, cross-examination by the Applicant established that Moore's testimony was her professional opinion and that she was not ruling out other reasonable hypothesis by which Tristen died. In addition, like the criminalist's testimony, that asphyxia was the cause and homicide the manner of Tristen's death has not been entirely refuted. As the convicting court determined, "[n]o expert rules out asphyxia as the cause of death," "[n]o expert can exclude Applicant as the perpetrator if it is a homicide, and no expert has excluded homicide as the manner of death." During the habeas proceedings, various experts have opined that the autopsy findings do not adequately support Moore's conclusion that the death was a homicide by asphyxiation (and Moore herself has adopted

that position[15]), but none of the experts have stated that Tristen could not have been intentionally asphyxiated. And although they critique Moore's interpretation of the petechiae evidence upon which she relied at trial, the "non-specific" indicator cannot be ruled out as being the result of asphyxiation. On the other hand, at least one well-qualified pathologist, Dr. Norton, has concluded that the child was a victim of homicide by asphyxiation.[16]

We must note that the convicting court concluded that "[a]t the time [Moore's] opinions were sworn to, they were false or at least gave a false impression." It is true that we have held that testimony may be false because it creates a false impression of the facts. *See Ghahremani*, 332 S.W.3d at 477-78 ("It is sufficient if the witness's testimony gives the trier of fact a false impression."). However, Moore's re-evaluation of her

---

[15]We note that the convicting court determined that Moore's deposition testimony lacked credibility:

. . . While her current conclusions are consistent with other experts' opinions, her stated reasons for her recantation or reevaluation are not consistent with the facts. Moore's claim that she did not have certain delineated facts at trial is not accurate. In addition, while she also states that her increase in training and experience gives her a stronger ability to now give opinions in this case, she does not provide any specific or sound pathological reasoning to support her changed opinions.

[16] The convicting court found the following about Norton's opinion:

The Court finds Dr. Norton's opinions credible and believable. Norton's extensive background and experience, as well as her ability to state specific underlying factual and pathological reasons for her opinions, are indicative of trustworthiness. On the other hand, her inability to present herself for a deposition and to be subject to cross examination lends support to the argument that her credibility and opinions as to cause and manner should be viewed as lacking the test of direct challenge. As a result Dr. Norton's opinions must be kept at arm's length when being reviewed under the standards imposed on this Court of habeas proceedings.

testimony can be distinguished from these instances of false testimony.

Generally, when we have held that testimony is false because it creates a false impression, the witness omitted or glossed over pertinent facts. For example, in *Alcorta v. Texas*, 355 U.S. 28 (1957), the defendant claimed that he murdered his wife as a result of sudden passion when he came home to find a man kissing her. The man, the only eye-witness to the murder, testified that his relationship with the wife was nothing more than a casual friendship in which he drove her home from work a few times. The Supreme Court held that such testimony was false; it created a false impression of the facts because, in actuality, the man was the wife's "lover and paramour," and the two had sexual intercourse on many occasions. *Id.* at 30-32. Similarly, in our recent case of *Ghahremani*, 332 S.W.3d 470, the victim's mother testified that after the victim was assaulted, the victim "gained weight, required therapy, and 'wasn't the same socially,'" but the mother denied that anything else was different about the victim during the time between the assault and the victim's intensive therapy.[17] *Id.* at 478-79. However, the habeas record showed that the victim sold drugs and was initiated into a gang during that period. We concluded that the witness's testimony created a misleading impression of the facts because of the gravity of the events omitted, the significant period of time that was not addressed, and the fact that the testimony attributed all of the psychological treatment

---

[17]The mother "mentioned only one intervening event between the applicant's assault and [the victim's] intensive therapy: a drug overdose, about which she gave no details." *Ghahremani*, 332 S.W.2d at 479.

to the defendant's actions. *Id.* at 479; *see also Burkhalter v. State*, 493 S.W.2d 214, 218 (holding that, although the witness's statement was not technically false, it "conveyed an impression to the jury which the State knew to be false" when the witness's lawyer had an understanding with the State that the witness would not be prosecuted if he testified, but the witness testified he did not have an agreement with the State).

In contrast to those cases, Moore's trial testimony did not result in a false impression of the facts. Unlike the witness in *Alcorta*, Moore testified openly about the autopsy findings and her professional opinion regarding the cause and manner of Tristen's death, and unlike the witness in *Ghahremani*, Moore did not omit pertinent details. As discussed previously, at trial, Moore explained the reasoning behind her original conclusion that Tristen's death was asphyxia-related. Also, neither Moore's conclusion nor the autopsy evidence upon which she relied has been entirely refuted by any expert. Accordingly, we do not believe that Moore's testimony was false; it did not create a false impression of the facts.

Applicant relies upon *Ex parte Henderson*, 246 S.W.3d 690 (Tex. Crim. App. 2007) (per curiam), in advancing his due process claim, but his argument is misplaced. There, the medical examiner testified at trial that it would have been "impossible" for the victim's injuries to have occurred as the defendant claimed. *Id.* at 691. Advances in scientific research subsequently indicated that it was possible for the injuries to have occurred in the claimed manner, so the medical examiner filed an affidavit stating that he

could no longer stand by his trial testimony. We held that his re-evaluation was a "material exculpatory fact." *Id.* at 692. Significant to this case is that, although we granted a request for the stay of defendant's execution and remanded the cause for an evidentiary hearing pursuant to a subsequent writ application, we did *not* find that any due process violation had occurred or that the defendant had succeeded in demonstrating her actual innocence. Thus, Applicant here may not rely on that case for such a proposition (i.e., that the admission of expert medical opinion testimony constituted a due process violation because the expert subsequently repudiated the opinion he offered at trial). Also, unlike *Henderson*, Moore's re-evaluation was not attributed to new scientific information but was instead based on the same autopsy findings and other information that she had at the time of trial.

For these reasons, Moore's trial testimony has not been proven false. Thus, the State did not use false evidence to obtain Applicant's conviction, and Applicant does not have a due process right to have a jury hear Moore's re-evaluation.

## IV. CONCLUSION

We conclude that Applicant has failed to establish that newly available evidence has unquestionably established his innocence under *Elizondo* and that it has not been proven that the State used false testimony to obtain Applicant's conviction. Relief is denied.

Meyers, J.

Delivered: June 29, 2011

Publish