

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,601

### JOSEPH FRANCOIS JEAN, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 1302120 IN THE 230TH DISTRICT COURT
### HARRIS COUNTY

KELLER, P.J., delivered the opinion of the Court in which MEYERS, PRICE, KEASLER, HERVEY, COCHRAN, and ALCALA, JJ., joined. WOMACK and JOHNSON, JJ., concurred.

In June 2011, appellant was convicted of killing teenaged cousins Chelsy Lang and Ashley Johnson in the same criminal transaction and was sentenced to death.[1] Direct appeal to this Court is automatic.[2] Appellant raises sixteen points of error. Finding no reversible

---

[1] TEX. PENAL CODE § 19.03(a)(7)(A); TEX. CODE CRIM. PROC. art. 37.071.

[2] TEX. CODE CRIM. PROC. art. 37.071, § 2(h).

error, we affirm the conviction and sentence of death.

## I. SUFFICIENCY OF THE EVIDENCE

In point of error one, appellant contends that the evidence was insufficient to support his conviction for capital murder. When reviewing a challenge to the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[3] To obtain a conviction for capital murder, as charged in this case, the State was required to prove that appellant intentionally or knowingly committed murder as defined by § 19.02(b)(1) of the Penal Code and murdered more than one person during the same criminal transaction.[4]

At trial, the evidence showed that appellant beat the two teenaged victims with a bat and then set them on fire inside the home of Victoria Wiley, Chelsy's mother and appellant's occasional romantic partner. Appellant's conviction is supported by his own extrajudicial confessions. In his first confession, appellant answered, "Yes, I did," when asked by a friend of his, Dorian "Deeno" Terry, if he committed the crimes. Appellant went on to elaborate that he "set the mother-fucker on fire, killed those two kids." Later, when being questioned by a detective, appellant stated, "[T]o tell the truth, I didn't mean to hurt them. I didn't go

---

[3] *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011).

[4] TEX. PENAL CODE § 19.03(a)(7)(A).

there to hurt my babies." Appellant added, "I hurt my baby, man."[5, 6]

There was also other evidence linking appellant to the murders. Several hours before the house was set ablaze, appellant had threatened Wiley at a night club, stating, "Bitch, I'm going to kill you." Appellant was angry when he made this threat and was removed from the club. Moreover, after his removal, appellant sent threatening text messages to Wiley, writing along the lines of "You done messed up. Just wait, I'm going to get you back," and "I will get you back, watch what I do." Appellant left the club with a friend in the friend's vehicle after staying in the parking lot for approximately an hour after appellant's ejection from the club. Appellant was impatient to get to his mother's home, so much so that, after the friend told him that he needed to make a quick stop at a local convenience store, appellant got out of the vehicle while it was stopped at a red light and proceeded towards his mother's house on foot. Appellant reportedly stated, "I can't wait. I can't wait. Fuck this shit. I can't wait. I can't wait. I've got to go." Appellant remained angry for quite some time after his encounter with Wiley, and he was in a rush to get somewhere in the area near Wiley's home. Phone records showed that the cell-phone tower associated with Wiley's residence was used

---

[5] Wiley testified that appellant had known her children since they were very young and treated them as a father would treat his own children.

[6] Appellant contends that his confession to the detective should not be considered evidence of his guilt because it was admitted in violation of his rights, as elaborated in his point of error two. Even assuming that this confession was inadmissible, in a sufficiency analysis, reviewing courts consider both properly and improperly admitted evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Thus, appellant's confession to the detective can be considered by this Court when reviewing the sufficiency of the evidence.

to relay a call made by appellant at around 4:14 a.m., and, according to images captured by a red-light camera, appellant jumped out of his friend's car at approximately 4:19 a.m., about two-tenths of a mile from appellant's mother's home and roughly two miles from Wiley's home, placing appellant in the area of the crime.

Also, evidence showed that Ashley sent her last text message at 4:26 a.m., and, around that same time, roughly ten minutes after appellant left his friend's car, another red-light camera captured the image of a car parking at a video store one block from Wiley's home. At 6:45 a.m., Jonathan Bradford, another friend of appellant, passed by and saw appellant running along the street towards the video store. Then, at 6:47 in the morning, a person entered the car parked at the video store and drove away. At about that same time, the fire department was notified of the fire, and approximately three minutes later, the red-light camera recorded fire trucks approaching the area. Thus, the fire occurred between the time that Ashley sent her last text message and the time appellant was seen running towards the video store parking lot, placing him near the scene of the crime at the time the crime was committed.

In addition, Bradford observed appellant in a sweaty and fatigued condition when he passed by him. Furthermore, Bradford stated that appellant's face indicated that "something was wrong." A baseball bat with the victims' blood on it, along with a gas can, was recovered just down the street from the scene of the crime. Wiley's son, Naquiel—who, in addition to Chelsy, lived with Wiley—had seen the bat in appellant's car a few days before

the murders. Additionally, Wiley had observed appellant use the gas can, which was also stained with Chelsy's blood, a week before when appellant had come over to the house to mow Wiley's lawn.

Furthermore, when speaking with the detective, appellant was asked about the bat he owned. He then volunteered that his bat was longer than the bat found by the officers near the crime scene, even though appellant had never been shown the recovered bat nor had its size been described to him.

Appellant had known Chelsy since she was a child and was a father figure to her.[7] But observers noted appellant's demeanor upon learning of her death as nonchalant and "not emotional whatsoever." He was also fidgety and sweaty. Later that day, when speaking with a detective in a non-custodial interview, he continued to show little emotion concerning Chelsy's death despite their close relationship, and he continued to display a nervous demeanor by sweating and fidgeting.

Appellant continued to engage in suspicious behavior the day following the fire. Appellant and his girlfriend conducted a computer search that consisted of the words "DNA fingerprinting, crime scene." This led to websites about how the FBI profiles suspects based on several investigative techniques.

Semen recovered from Ashley's rectum was tested and compared to a DNA sample from appellant. The DNA analyst, Barbara Leal, explained at trial that results from

---

[7] *See supra* note 5.

seventeen locations are required to obtain a full Y-STR profile. However, Leal stated that she was able to obtain results from only ten locations from the swab, meaning the DNA profile was incomplete. But, even then, comparing appellant's sample with the one recovered from Ashley showed that appellant's sample matched the ten locations from which results could be obtained. Leal determined that appellant's profile was not common, meaning it was unlikely that a randomly chosen male would possess a profile that matched the ten locations found on the swab from Ashley. Thus, although there was not enough DNA present in the rectal swab taken from Ashley to definitively inculpate appellant, he could not be excluded as the contributor either. A "cannot exclude" DNA determination, while not necessarily dispositive, is probative of guilt.[8]

The jury was also presented with evidence that there was no forced entry into the home, which complemented evidence that appellant had a key to the home, and Wiley testified that, in the past, when appellant had come over to the house, her children had let him in because of their close relationship.

Finally, the detective who interviewed appellant several days after the fire noticed that appellant's hands were blistered.

---

[8] *See Ex parte Campbell*, 226 S.W.3d 418, 423 n.15 (Tex. Crim. App. 2007) (stating that if a piece of evidence found near the crime scene "were tested for DNA and applicant could not be excluded as a contributor, that evidence would be inculpatory"); *see also United States v. Kent*, 531 F.3d 642, 651 (8th Cir. 2008) ("[A] 'cannot exclude' finding can tell a lot, and can increase the probability that the person's DNA is present." (quoting *United States v. Mitchell*, 502 F.3d 931, 970 (9th Cir. 2007))).

Based on the evidence presented at trial, a rational jury could have found the essential elements of the offense appellant was charged with beyond a reasonable doubt. Point of error one is overruled.

## II. ADMISSION OF VIDEOTAPED STATEMENT

In point of error two, appellant contends that the trial court erred when admitting his videotaped custodial statements in which he told detectives "I didn't mean to hurt them. I didn't go there to hurt my babies," and "I hurt my baby, man." Appellant maintains that these statements were inadmissible because he had invoked his right to remain silent shortly before he made them.

We review a trial court's decision regarding the admissibility of evidence under an abuse-of-discretion standard.[9] Because trial courts are in the best position to decide questions of admissibility, appellate courts uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement.[10] An appellate court may not reverse a trial court's decision regarding the admissibility of evidence solely because the appellate court disagrees with the decision.[11] "[T]he trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the

---

[9] *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007) (citations omitted).

[10] *Id.*

[11] *Id.*

case."[12]

The United States Supreme Court has held that in order to safeguard a defendant's Fifth Amendment right to not be a witness against himself before the government may admit a statement against a defendant at trial, it must inform a suspect who is subject to custodial interrogation that he has certain rights, including the right to remain silent.[13] If the suspect invokes his right to silence, the interrogation must immediately cease, and the officers must scrupulously honor that invocation.[14] But the government may resume questioning a suspect who has previously invoked his right to remain silent, provided that it was the suspect who initiated further discussion about the investigation.[15] "Initiation" in this context means "an inquiry representing a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation."[16]

Here, appellant was arrested on an unrelated parole violation. Two days later, he was taken to an interview room and interviewed by detectives concerning the murders of Chelsy

---

[12] *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

[13] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *Ramos*, 245 S.W.3d at 418.

[14] *Ramos*, 245 S.W.3d at 418 (citing *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975)).

[15] *Trevino v. State*, 815 S.W.2d 592, 618-19 (Tex. Crim. App. 1991), *rev'd on other grounds*, 503 U.S. 562 (1992).

[16] *Janecka v. State*, 739 S.W.2d 813, 829 (Tex. Crim. App. 1987) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983)); *see also United States v. Thongsophaporn*, 503 F.3d 51, 56 (1ˢᵗ Cir. 2007).

and Ashley. Appellant was informed of his rights and invoked his right to remain silent. The interview ceased. Before appellant was escorted back to jail, the detectives took some photographs of the blisters on appellant's hand and his tattoos. During that time appellant asked the detectives what he was charged with, and one of them replied that he would be charged with capital murder. Appellant then inquired about the applicable punishment for that charge, and the detective answered, "Life or death" and advised appellant that, because he invoked his rights, the detectives could not discuss the case with him further. Outside the interview room, as appellant was being escorted back to jail, he became emotional and indicated that he did not want to be executed. He was again informed that the detectives could not discuss the case.

Appellant started to become concerned about what the public would think of him and the impact the case would have on his family, and he expressed concerns about being executed. He then requested to "cut . . . a deal," which he was informed could not be done by the detectives. Because of the questions and comments by appellant after he invoked his rights, one of the detectives asked appellant if he wanted to talk. Appellant replied, "Yes." After that, appellant was returned to the interview room, a new video recording was begun, appellant was read his rights, he waived them, and he made his incriminating statements.

Appellant initiated the conversation with the police after they ceased the original interview. First, appellant asked what he would be charged with. Then, he asked about the

applicable punishment range. These questions alone would suffice to initiate contact,[17] but appellant went further. Even though the detectives repeatedly informed appellant that they could not speak with him about the case, appellant asked what kind of impact the case would have on him and his family, he said that he did not want to die, and he inquired about making a deal in the case. Ultimately, a detective asked if appellant wanted to continue speaking about the case, and he answered in the affirmative. Therefore, after the detectives had scrupulously honored appellant's original request to remain silent, he initiated further conversation with them, rendering his subsequent statement admissible. Point of error two is overruled.

### III. ADMISSION OF CRIME-SCENE PHOTOS

In point of error three, appellant contends that the trial court erred in admitting seven crime-scene photographs that he says were not relevant, and he claims that any probative value they may have had was substantially outweighed by the danger of unfair prejudice.[18] A trial court's decision regarding the admissibility of evidence is reviewed under an abuse-of-discretion standard.[19]

---

[17] *See Bradshaw*, 462 U.S. at 1045-46 (holding that a suspect's asking "Well, what is going to happen to me now?" initiated conversation after his rights were invoked); *Hunter v. State*, 148 S.W.3d 526, 529-30 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (holding that a defendant's asking about the applicable punishment range has initiated conversation).

[18] TEX. R. EVID. 401-403.

[19] *See supra* notes 9-12 and accompanying text. *See also Shuffield v. State*, 189 S.W.3d 782, 786 (Tex. Crim. App. 2006) ("The admissibility of a photograph is within the

(continued...)

Over appellant's objection, the trial court admitted a number of color photographs of the victims taken at the crime scene. Appellant contends that State's exhibits 65, 66, 69, 70, 76, 77, and 82 were improperly admitted. Exhibits 65 and 66 show the position of Chelsy's body and its location in the room, as it was found by the police and firefighters. Exhibit 69 shows Chelsy's hand and exhibit 70 shows her head, both burned. Exhibits 76 and 77 show the position and location of Ashley's body in the room in which it was found. Exhibit 82 shows Ashley's pants wrapped around her leg.

Photographs depicting the location of a body at the crime scene and the victim's injuries are relevant.[20] And, even if photographs are gruesome, under Rule 403 their probative value is not substantially outweighed by the danger of unfair prejudice if "they are no more gruesome than the crime scene itself as it was found by the police."[21] Likewise, under Rule 403, photographs of a victim's injuries are admissible if they "show only the injuries that the victim received and are no more gruesome than would be expected."[22] Moreover, "[t]he fact that the jury also heard testimony regarding the injuries depicted does

[19](...continued)
sound discretion of the trial judge.").

[20] *See, e.g.*, *Shuffield*, 189 S.W.3d at 787.

[21] *Id.*

[22] *Id.* at 787-88.

not reduce the relevance of the visual depiction."[23] Thus, the trial court did not err in admitting Exhibits 65, 66, 69, 70, 76, and 77; they showed the victims' positions and locations in the room and their injuries, and were thus relevant, and the gruesomeness of the photographs was not more "than the crime scene itself" or "than would be expected," thus making them more probative than prejudicial. The fact that witnesses later testified concerning the same information depicted in the photographs does not mean that the photographs were improperly admitted.

State's Exhibit 82 was also properly admitted. That photograph depicts Ashley after she had been moved from her original location and placed on top of a body bag at the scene. The State explained to the trial court that this photograph was still relevant because, by depicting Ashley's pants pulled down and wrapped around her leg, it tended to show that Ashley had been sexually assaulted.

Evidence of a sexual assault was relevant to show the identity of the perpetrator of the murders. As noted above, a semen sample was recovered from Ashley's rectum. While only a partial match connected appellant to the sample, he could not be excluded as the person who supplied the semen sample, which made the sample probative of his guilt. Therefore, because evidence of a sexual assault was relevant to the case, and State's Exhibit 82 depicts circumstances of a sexual assault, the photograph was relevant. And, as with the exhibits discussed above, the probative value of the photographs was not substantially outweighed

---

[23] *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007).

by the danger of unfair prejudice under Rule 403 because the gruesomeness of the photographs was no more than to be expected under the circumstances of the crime.

Even if there were error in admitting the photographs, the improper admission of evidence is rendered harmless when similar evidence is properly admitted elsewhere.[24] Here, several similar autopsy photographs depicting the bodies and organs of the victims were admitted without objection. As a result, even if admitting the above photographs was error, such error was harmless. Point of error three is overruled.

## IV. ADMISSION OF EXTRANEOUS OFFENSE

In point of error four, appellant maintains that the trial court erred in admitting evidence of an extraneous offense[25]—specifically, testimony from two witnesses that he threatened to kill Wiley several hours before the fire. We initially address whether appellant preserved this issue for our review. To preserve error for appellate review, a party must make a timely and specific objection or motion at trial, and there must be an adverse ruling by the trial court. Failure to preserve error at trial forfeits the later assertion of that error on appeal. Almost all error—even constitutional error—may be forfeited if the appellant failed to object. We have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence.[26]

---

[24] *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010).

[25] TEX. R. EVID. 404(b).

[26] *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008).

Appellant contends that a motion *in limine* made before trial concerning the threats preserved this issue. A motion *in limine*, however, is a preliminary matter and normally preserves nothing for appellate review. For error to be preserved with regard to the subject of a motion *in limine*, an objection must be made at the time the subject is raised during trial.[27]

Appellant made no objections at trial to the testimony concerning the threats. Therefore, appellant has forfeited appellate review of this issue. Point of error four is overruled.

## V. CREDIBILITY DETERMINATION

In point of error five, appellant contends that the trial court erred in not making a credibility determination before its pretrial ruling that evidence of appellant's threat to kill Wiley was admissible. Appellant cites to *Harrell v. State*[28] to advance this contention.

*Harrell*, however, does not require the trial court to make any credibility determinations. *Harrell* was concerned with the standard of proof—i.e., preponderance of the evidence or beyond a reasonable doubt—necessary for admission of an extraneous offense. *Harrell* held that, when the State proffers evidence of an extraneous offense, the trial court must make an initial determination that the jury could find beyond a reasonable

---

[27] *Id.*

[28] 884 S.W.2d 154 (Tex. Crim. App. 1994).

doubt that the defendant committed the offense.[29]   The jury, not the trial court, is "the sole judge of a witness's credibility."[30]   We are aware of no authority that says otherwise. Therefore, the trial court committed no error when it failed to make any credibility determinations with regard to the witnesses who would testify as to the threat appellant made to kill Wiley.  Point of error five is overruled.

## VI. ADMISSION OF THE DNA ANALYST'S TESTIMONY

In point of error six, appellant contends that the trial court erred in allowing the State to elicit testimony that testing of the DNA sample found on the baseball bat produced "inconclusive" results as to the identity of the sample contributor because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.[31]   Whether evidence was properly admitted is reviewed under an abuse-of-discretion standard.[32]

The DNA analyst, Michal Pierce, testified that she analyzed two DNA samples from the baseball bat recovered near the crime scene.  The first was a blood sample, in which Chelsy was a major contributor and Ashley could not be excluded as a minor contributor. Appellant, however, was excluded from this particular sample.

---

[29] *Id.* at 160.

[30] *See Brooks v. State*, 323 S.W.3d 893, 901-02 (Tex. Crim. App. 2010) (internal quotation marks omitted).

[31] See TEX. R. EVID. 403.

[32] *See supra* notes 9-12 and accompanying text.

The other DNA sample did not yield a full DNA profile. Nevertheless, even with this partial DNA sample, Pierce was able to exclude several people connected with the investigation, but not appellant, Chelsy, or Ashley. Also, the sample included DNA from at least one male contributor. Ultimately, it could not be said whether appellant was excluded, leading to an "inconclusive" result.

Rule 403 limits the admission of otherwise relevant evidence when that evidence's probative value is substantially outweighed by the risk of unfair prejudice. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial."[33] "In keeping with the presumption of admissibility of relevant evidence, trial courts should favor admission in close cases."[34] A Rule 403 analysis considers the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; (4) the proponent's need for the evidence.[35]

Considering the first factor, the DNA results were probative even though they were inconclusive. Even with only a partial DNA profile, Pierce was able to determine that a male had contributed to the sample and that several males connected to the investigation could be excluded as a contributor, but, significantly, not appellant. The inability to exclude appellant

---

[33] *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007).

[34] *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).

[35] *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).

was probative of his guilt.[36]

Considering the second factor, Pierce's testimony did not impress the jury in some irrational, yet indelible, way. Appellant contends that the State questioned Pierce in such a way that, even though she said the results were "inconclusive," the jury would believe that the sample was still "likely" from appellant. We disagree. When the State asked a clarifying question, "Not enough information to say [Chelsy, Ashley, and appellant] couldn't be excluded, but not enough to exclude them?" Pierce answered, "Correct." Reading the testimony that was presented to the jury, there is no indication that the State's questions or Pierce's answers suggested anything other than an "inconclusive" result meant that appellant could not be included or excluded as the contributor.

The third 403 factor, the time needed to develop the evidence, also does not weigh in favor of appellant. Pierce's testimony on this point was short.

The final factor, the State's need for the evidence, worked in the State's favor in two ways. First, the main issue in the case was whether appellant was the perpetrator of the crime. Pierce's testimony, while presenting "inconclusive" DNA results, was able to show that appellant could not be excluded, while others could. Second, Pierce's testimony demonstrated that the State had explored many avenues in determining the identity of the perpetrator. This undercut any possible claims by the defense that the State was sloppy, haphazard, or not thorough when trying appellant for the crime. Therefore, the trial court did

---

[36] *See supra* note 8 and accompanying text.

not err in admitting Pierce's testimony.  Point of error six is overruled.

## VII. ADMISSION OF EVIDENCE OF A SEXUAL ASSAULT

In point of error seven, appellant contends that the trial court erred when it admitted DNA evidence recovered from Ashley's rectum that suggested that she had been sexually assaulted.  Appellant argues that that evidence was not relevant.  Appellant made no Rule 403 objection, nor does he argue Rule 403 prejudice on appeal.

Generally, evidence of other crimes is not admissible against a defendant in a criminal case.[37]  Such evidence, however, may be admissible for other purposes, such as to show identity.[38]  Here, the DNA evidence easily met the test for relevance and was, thus, properly admitted because it helped establish appellant's identity as Chelsy and Ashley's killer in two intertwined ways.

First, while a full DNA profile could not be obtained from the semen, appellant could not be excluded as a contributor.  Appellant's DNA matched the parts of the semen sample that could be identified, and the DNA analyst was able to determine that appellant did not have a common DNA profile.  Thus, appellant could not be excluded as the contributor, which provided some evidence to establish that he was, in fact, the contributor of the semen, which, in turn, was probative of his guilt.[39]

---

[37] TEX. R. EVID. 404(b).

[38] *Id.*

[39] *See supra* note 8 and accompanying text.

Second, the evidence at trial indicated that the sexual assault on Ashley occurred at or near the time of the murders. Wiley called home several hours before the murders, and there was no indication then that something as serious as a sexual assault had occurred. Moreover, Ashley sent a text message just before 4:30 a.m., and the fire was reported just before 6:50 a.m, both of which times coincide with the time appellant was known to be in the area. And, when Ashley was found by investigators, her shorts had been lowered and wrapped around her leg, exposing her genitals, which suggests that the killing and sexual assault occurred at the same time. Thus, the evidence shows that appellant committed the killings and that the killings occurred at the same time as the sexual assault on Ashley. Therefore, the trial court did not err because evidence connecting appellant to the sexual assault was relevant to show appellant's identity as the murderer.

Even if appellant had raised a Rule 403 objection and argued such on appeal, the trial court did not err. Considering the factors used in a 403 analysis,[40] the probative value of the DNA evidence was not substantially outweighed by the danger of unfair prejudice. The evidence was probative because it linked appellant to the murders by showing that he was a possible contributor of the semen sample. The evidence itself was not gruesome or emotion provoking so as to unduly influence the jury. And the State did need the DNA evidence as it provided a strong link between appellant and the murders. While the evidence did take some time to develop, which is unsurprising considering the complexity of DNA

---

[40] *See supra* note 35 and accompanying text.

evidence, that factor is more than outweighed by the others. Point of error seven is overruled.

## VIII. CONSTITUTIONAL ISSUES REGARDING THE DEATH PENALTY

In points of error eight through sixteen, appellant raises constitutional challenges to the Texas death-penalty statute. In points of error eight through ten—combined by appellant into one argument—appellant contends that 1) "the mitigation special issue fails to place the burden of proof on the State," 2) the death-penalty statute "impermissibly shifts the burden of proof on mitigation to the defendant and is not specific as to the exact burden of proof," and 3) the trial court erred in the portion of the jury charge "relating to the burden of proof" on the mitigation special issue. Appellant acknowledges that this Court has previously addressed these issues and decided them adversely to him.[41]

In point of error eleven, appellant maintains that the trial court erred when it failed to declare the Texas capital-sentencing scheme unconstitutional "because the statutory mitigation special issue permits the very type of open-ended discretion condemned by the [United States] Supreme Court in *Fermion v. Georgia*.[42]" This Court has rejected this

---

[41] *See Smith v. State*, 297 S.W.3d 260, 277-78 (Tex. Crim. App. 2009) (noting that the mitigation special issue is a defensive issue for which the State has no burden of proof); *Luna v. State*, 268 S.W.3d 594, 609 (Tex. Crim. App. 2008) (rejecting the appellant's claim that Article 37.071 is unconstitutional because it impermissibly shifts the burden of proof to the defendant); *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008) (rejecting the appellant's complaint about the mitigation special issue's failure to place the burden of proof on the State).

[42] 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

argument.[43]

In point of error twelve, appellant contends that the trial court erred when it failed to declare the Texas death-penalty statute unconstitutional because it fails to "require mitigation evidence to be considered." We have rejected this claim.[44]

In point of error thirteen, appellant claims that the trial court erred in refusing to declare the Texas capital-sentencing scheme unconstitutional on the basis that the "10-12 rule" in Article 37.071 violates the Eighth Amendment to the United States Constitution. Appellant acknowledges that we have rejected this argument.[45]

In point of error fourteen, appellant asserts that the trial court erred when it did not declare that the Texas capital-sentencing statute unconstitutional because it fails to "inform the jury that a single holdout juror on any special issue would result in an automatic life sentence" and is thus in violation of the Eighth and Fourteenth Amendments to the United States constitution. Appellant acknowledges that this Court has decided this issue adversely to him.[46]

In points of error fifteen and sixteen—combined by appellant into one argument—appellant maintains that the trial court erred when it refused to declare the Texas

---

[43] *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009).

[44] *Whitaker v. State*, 286 S.W.3d 355, 369-70 (Tex. Crim. App. 2009).

[45] *E.g.*, *Leza v. State*, 351 S.W.3d 344, 361-62 (Tex. Crim. App. 2011).

[46] *Russeau v. State,* 171 S.W.3d 871, 886 (Tex. Crim. App. 2005), *restated in appeal after remand*, 291 S.W.3d 426, 438 (Tex. Crim. App. 2009).

capital-sentencing scheme unconstitutional because its definition of mitigating evidence limits the Eighth Amendment concept of "mitigation" to factors that render a defendant less morally blameworthy for the commission of capital murder. We have rejected this argument.[47]

We decline appellant's invitation to review our prior decisions concerning the issues addressed in his points of error eight through sixteen.[48] Points of error eight through sixteen are overruled.

The judgment of the trial court is affirmed.

Delivered: June 26, 2013
Do Not Publish

---

[47] *Williams*, 301 S.W.3d at 694.

[48] *Saltine v. State*, 232 S.W.3d 77, 108-09 (Tex. Crim App. 2007).